## THE CLANDEBOYE.

### STRICKLAND v. LOMM.

(Circuit Court of Appeals, Fourth Circuit. November 7, 1895.)

### No. 130.

1. SALVAGE—UNFAIR CONTRACT—COMPENSATION—FRAUD.

A British steamship, bound for Vera Cruz, arrived disabled at the Little Bahamas. Her mate was sent in the ship's boat to Savannah, whence he communicated with the owners, by whom the tug M., lying at Philadelphia, was chartered to tow the ship to Vera Cruz for $5,000. The master of the tug D., lying at Brunswick, Ga., learning from the newspapers the situation of the vessel, telegraphed to Savannah, and received a reply, stating the facts in regard to the chartering of the M. He thereupon started with his own tug for the Little Bahamas, and, arriving before the M., without disclosing the fact of the latter's employment, made a salvage contract with the steamship's master, under which he towed her to Newport News, and was awarded by the district court of that district $10,000 salvage. *Held* that, owing to the suppression of the facts by the master of the D., the parties to the contract did not deal on equal terms, that the analogies of the doctrine of caveat emptor did not apply, and that the contract must be set aside.

2. SAME.

It appearing, however, in such case, upon a comparison of the items of expense actually incurred by the steamship with those which would apparently have attended a towage to Vera Cruz by the M., that the steamship was actually benefited by the services of the D. in a sum estimated at $1,000, *held*, that this amount should be awarded to the latter. Goff, Circuit Judge, dissenting, on the ground that the master of the D. was guilty of a fraud, whereby all right to salvage compensation was forfeited.

Appeal from the District Court of the United States for the Eastern District of Virginia.

This was a libel by Leo Lomm, master of the steamtug Dauntless, against the steamship Clandeboye, W. H. Strickland, master, claimant, to recover compensation for salvage service. The circuit court rendered a decree awarding salvage in the sum of $10,000, from which the claimant has appealed.

Wilhelmus Mynderse (of Butler, Stillman & Hubbard), for appellant.

Robert M. Hughes, for appellee.

SEYMOUR, District Judge. The material facts of the case are as follows: The Clandeboye, a large and valuable British steamer, had become disabled by breakage of machinery, and had arrived off the Little Bahama islands. Her mate had been sent by a ship's boat for assistance, and had on the 15th of May, 1894, arrived at Savannah. In pursuance of telegraphic instructions cabled to him by the owners, he had engaged the services of the Morse of New York, then, however, lying at the port of Philadelphia, which had agreed to proceed forthwith to the Little Bahamas, and tow the Clandeboye to Vera Cruz, her port of destination, for the sum of $5,000. Leo Lomm, the libelant, part owner and master of the tug Dauntless, lying at the time at its home port of Brunswick, Ga., having learned from the Savannah papers of the arrival at that port of the mate of the Clandeboye, and of the condition and location of that vessel, on the 17th of May telegraphed, through his agents, to Savannah, and received a reply stating that the tug Morse of New York had been chartered to go to the assistance of the Clandeboye. The distance from New York—and that from Philadelphia is about the same—to Stranger's Cay, where the Clandeboye was lying, is more than 1,000 miles. From Brunswick the distance is about one-third as great. Capt. Lomm's boat was lying idle. He concluded that he could beat the Morse in a race to the Clandeboye, and that, the master of the latter not knowing of the employment of the Morse, he could obtain a profitable job of salvage. The telegram announcing the employment of the Morse by the Clandeboye's owners reached Brunswick at a little after 3 p. m. of the 17th. Shortly after dark of the same day the Dauntless started for the Bahamas. She arrived at Stranger's Cay before noon of the 19th. Her master had the interview, and made with the master of the Clandeboye the contract, which is a matter in litigation, immediately thereafter, and in a couple of hours the vessels left for Newport News, one in tow of the other. Between three and four days afterwards the Morse reached the spot where the Clandeboye had been lying at anchor, to find that she had gone. The conversation between the masters of the steamer and of the tug at Stranger's Cay contains the contract entered into between them and the words that led up to it. Capt. Strickland's testimony upon the subject is as follows:

"Question. What time did the Dauntless come along? Answer. About 12:30. Q. And the captain came aboard? A. Yes, sir. Q. Who came with him? A. A man he has got with him as navigator. The captain is no navigator, and he brought a man, specially, with him. Q. What did he do when he came aboard? A. Went down to the cabin. Q. What did you do then? A. I asked him what he would tow the ship to Vera Cruz for, but he said he couldn't go there at any price; said he had no papers, for one thing, and that if he went his ship would be confiscated. I asked where he would tow us, and he said Nassau. I knew there was no way to dock her at Nassau, and he had no coals to take her anywhere else, and I arranged to tow her to Brunswick, so he could get coals, and after that to Newport News. Q. Might you not have coaled him out of your own bunkers? A. Yes, sir; I offered to. Q. What objection was made to that? A. Didn't make them, sir, except he wouldn't have them. I suppose he thought I would charge him for them. Q. Just state, more in detail, what your conversation was? A. That's as near as I can remember. I asked what he would tow the ship to Newport

News for, and he said wherever he towed her we had better not make any arrangement; it had better be left to the owners, to be settled by arbitration. He wouldn't make any bargain, at all. Q. Did he say anything as to how he ascertained you were there, or anything about your mate, or boat's crew? A. Yes; he said he had seen in a Savannah paper that the boat had arrived in Savannah, and on the strength of that he came out. He reported to me that the boat and crew were all right. Q. Did he tell you that the owners of the Clandeboye had engaged a tug to come for you? A. No, sir. Q. Did he say anything more, respecting the mate and his crew, beyond the fact that the papers said they had arrived? A. That was all, sir. Q. He gave you no information that the owners were seeking assistance to come for you? A. No, sir."

### Capt. Lomm's testimony is:

"Question. Relate the conversation that occurred between you and him. Answer. When I got aboard the steamship,—I and Captain Curtis,—we were met by the captain, who says, 'Come down below,' meaning in the cabin, of course; and, as we were going along the deck, the captain says, 'Did you hear anything of my mate and boat?' and I said, 'Yes, sir; he is in Savannah;' and the captain turned round and told the men, 'The mate is all right; the mate and boat is all right.' He said, 'Tell that to the balance of the crew of the ship.' We went down below, in the cabin, and, after we got down there, the captain said, 'You say the mate is in Savannah?' and I said, 'Yes, sir.' He says, 'Did the mate send you?' and I said, 'No, sir.' He said, 'What brought you here?' I told him I had seen, in the Savannah Morning News, where his mate and boat had arrived in Savannah and wanted assistance, that the ship was disabled, and that she was on Bahama banks; and then he said, 'You came on a spec.?' Then I said, 'Yes, sir.' So he told me he was offered assistance yesterday, and I said, 'By a steamer?' and he said: 'No, sir; these schooners round here came here yesterday, and wanted me to get up my anchor, and said they would tow me in, but I knew they wanted nothing else but to get my anchor off the bottom, and drift ashore, so that they could get a chance to wreck my steamer. But,' he says, 'I expect a tug in a day or two,' as he had engaged a schooner or two to go to Nassau with a cable, and also to Jacksonville, to get tugs for him. 'So,' he said, 'this is one of the cases, "first come, first served." ' Then we were talking about where he wanted to go, and he said he wanted to go to Vera Cruz, and I said I could not tow him to Vera Cruz. He wanted to know the reason, and I told him, in the first place, I couldn't carry coal enough to carry us to Very Cruz. Then, again, I was not insured anywhere except the Atlantic, and then, again, it was in a foreign port, and a Spanish port besides; and I suggested to tow him to Brunswick or Savannah, and he said he couldn't do anything there, as they had to go in the dry dock to be repaired. Then I told him Norfolk or Newport News is the best place I know of, and he said, 'Yes; I know they have got a good dry dock in Newport News;' and then it was agreed to tow him to Newport News."

The material facts in the testimony quoted are that Capt. Lomm told Capt. Strickland of the arrival of his mate in Savannah, but did not tell him of the employment of the Morse for his relief. The result of the enterprise of Capt. Lomm will be disastrous to the owners of the Clandeboye if the decree of the district court is allowed to stand. Capt. Lomm declined to take the Clandeboye to Vera Cruz, the port to which her cargo was consigned, and did tow her to Newport News, where she was repaired. Fifteen hundred tons of her cargo had to be unloaded and then reloaded before she proceeded to Vera Cruz. Her owners were compelled to pay to the owners of the Morse the sum of $1,900 for the services of that tug, and salvage compensation amounting to $10,000—double what the Morse had agreed to charge for towing the Clandeboye to Vera Cruz—has been awarded to the Dauntless. But the master of the steamship, in

charge of his vessel, and not in communication with his owners, was fully empowered to contract with the owners of the Dauntless. The contract made was binding, unless invalidated by the conduct of Capt. Lomm in concealing the fact that the owners of the Clandeboye had engaged the services of the Morse. As is said by the judge in the court below:

"Whether or not the right of Captain Lomm to a salvage reward was forfeited by his silence on the subject of the employment of the Morse, in his conferences at the Little Bahama banks with Captain Strickland, is the question on which this case depends. There is no doubt that Captain Lomm ought to have given this information to Captain Strickland. The question is, whether his obligation to do so was so stringent as to constitute the omission a fraudulent piece of deception."

While the right to salvage does not necessarily always arise out of an actual contract, it does so in the case at bar. Services spontaneously rendered to vessels wrecked, or, under the conditions of an earlier period, set upon by pirates, or attacked by enemies, or captured and rescued, are recompensed with salvage money, whether the services were or were not requested. The present case, however, is one of a different character. The Clandeboye, at anchor off the Bahamas, though disabled, and in a position of contingent peril, was not wrecked. She had remained 11 days without injury where she then was, and was under the plenary control of her master, who was at full liberty to accept or refuse the services of the Dauntless. The arrangement entered into between the two masters constituted a contract, and is subject to the principles which regulate the validity of contracts. If valid, the courts of admiralty are bound to enforce it; if not, to set it aside, in accordance with the general rules affecting all contracts. The law of contracts requires of the parties to them mutual good faith. Is there any principle of mercantile law by which that obligation to good faith which required Capt. Lomm to inform Capt. Strickland of the hiring of the Morse is relaxed, and is not of so stringent a force as to make the omission fraudulent? If there is, it must be sought in the analogies of the rule of caveat emptor. The doctrine of caveat emptor belongs, strictly speaking, to the law of sales, but its principles apply to other contracts. Nor is it a doctrine peculiar to the common law. It is in force in all mercantile communities, and has always been administered under the civil law. Pothier says, speaking of the contract of sale: "Good faith prohibits, not only falsehood, but all suppression of everything which he with whom we contract has an interest in knowing, touching the thing which makes the object of the contract;" but he adds, speaking of contracts where one party has not revealed all his information to the other: "The interest of commerce" does not permit "parties to be readily admitted to demand a dissolution of bargains which have been concluded; they must impute it to themselves in not being better informed." Poth. Cont. Sale, pt. 2, c. 2, §§ 234, 239. In the case of Laidlaw v. Organ, Chief Justice Marshall says: "The question in this case is whether the intelligence of extrinsic circumstances which might influence the price of the commodity, and which was exclusively within the knowledge of the vendee, ought to have been communicated by him to the vendor. The court is of the

opinion that he was not bound to communicate it. It would be diffi-cult to circumscribe the contrary doctrine within proper limits, where the means of intelligence are equally accessible to both parties." Laidlaw v. Organ, 2 Wheat. 178. "Under the general doctrine of caveat emptor, the vendor is not ordinarily bound to disclose every defect of which he may be cognizant, although his silence may oper-ate virtually to deceive the vendee." Story, Cont. § 516. The general rule, both of law and equity, in respect to concealments, is that mere silence with regard to a material fact which there is no obligation to divulge will not avoid a contract. Thus if A., know-ing that there is a mine in the land of B., of which B. is ignorant, should contract to purchase the land without divulging the fact, it would be a valid contract, although the land were sold at a price which it would be worth without the mine, because A. is under no legal obligation, by the nature of the contract, to give any informa-tion thereof. Fox v. Mackreth, 2 Brown, Ch. 400, 1 White & T. Lead. Cas. Eq. *172. "Without some such general rule the facilities of sale would be greatly impeded, and there would be no security to the vendor" or to the vendee. Story, Cont. § 517.

It will be noticed that the general rule of law is a requirement of good faith in mutual dealings, and that the doctrine of caveat emptor is an exception to such requirement, founded upon special reasons, viz. the necessities of commerce, and the impossibility of so limiting any other doctrine as to do justice. As Chief Justice Mar-shall says, "it would be difficult to circumscribe the contrary doctrine within proper limits." The necessities of commerce require that enterprise should be encouraged by allowing diligence at least its due reward, and not interfering with any proper and reasonably fair competition for intelligence. Any other course would set the active and the slothful upon an equality. "Vigilantibus non dormientibus jura subveniunt."

Even more weighty is the second reason given in support of the doctrine. The law works with blunt tools. Fallible memories, prejudiced statements, intentional falsehood, the bias of self interest, ignorance, and stupidity, are all concomitants of much of the testi-mony from which she has to make up her judgments. General rules, applicable to the majority of cases, but sometimes having an oppress-ive bearing upon particular ones, make up the principles upon which, of necessity, she founds her decisions, for the law must be workable. It must be comprehensible to men who live under its rule, and must not be so complex as to overburden the memory with minutiæ. Further, were it open, in all cases of contracts, for a dis-satisfied party to cry off, by saying that the other party had known better than he the value of the subject-matter, or the market price, or some other extrinsic circumstance, there would be no finality in human dealings, and the only limitation to the litigation that would ensue would be that imposed by the diminution of business caused by such want of finality and certainty.

But caveat emptor is but the exception, and not the rule. Its operation is to be diligently circumscribed within proper limits. The doctrine is not applied (1) to cases of active fraud, one variety of which consists in misrepresentation of facts, including what is often

equivalent, partial statements; it is not applied (2) to cases in which trust is implied by reason either of the relations to one another of the parties, or the nature of the contract; nor (3) to cases in which, in the absence of laches in the party injured, the persons dealing with one another do not deal upon mutually equal terms, by reason of there being special knowledge in the possession of one party which is inaccessible to the other.

(1) The case of actual or implied misrepresentation needs no illustration.

(2) That of trust includes all the known fiduciary relations,—such as those of attorney and client, guardian and ward, agent and principal, and generally of all who stand in the relation of trustee and cestui que trust. It also includes dealings with regard to all matters which from their nature demand mutual confidence. One seeking insurance is bound to state all facts within his knowledge which would have an influence on the terms of the contract, but are unknown to the insurer. A vendor of goods is bound to point out any latent defect in them known to himself. A person selling negotiable paper warrants that he has no knowledge of any facts which prove it worthless. It is held that if one sells to another a check of a third party, knowing that other checks of the same party have been recently dishonored, without communicating the fact to the buyer, it is a fraudulent concealment. Brown v. Montgomery, 20 N. Y. 287.

(3) The case of information possessed by one party and absolutely unobtainable by the other, though of rarer occurrence, is one in which the enforcement of the rule of good faith is fully as imperative as it is in the two classes of cases first mentioned. It is perhaps not properly an exception to the doctrine of caveat emptor, but rather a case outside of its terms. The purchaser cannot look out for what he cannot have knowledge of. It is thus stated by Chancellor Kent in his Commentaries: "If there be an intentional concealment or suppression of material facts in the making of a contract in cases in which both parties have not equal access to the means of information, it will be deemed unfair dealing, and will vitiate and avoid the contract." 2 Kent, Comm. lect. 39, *482. It is implied in Judge Marshall's opinion in Laidlaw v. Organ, already cited, in the sentence ending with the words, "where the means of intelligence are equally accessible to both parties." Supra. Under this exception, more logically than under that of special confidence, where it is generally placed in the text books, comes the obligation of one who has manufactured goods to reveal to a purchaser any latent defect in them known to himself, and the similar obligation of a vendor of real estate to inform a vendee of all incumbrances placed by himself upon the land. Where one party to a contract has information inaccessible to the other, neither of the reasons assigned for the principle of caveat emptor applies. The contract is not one which should be sustained to encourage mercantile competition and diligence; for, where knowledge cannot be obtained, competition is impossible and diligence useless, there can be no vigilance to be rewarded or sloth to be discouraged. Nor would much danger of unsettling the finality of business transactions or of opening bargains to the uncertainties of conflicting testimony about the equality

of knowledge of the parties be likely to arise by reason of the invalidating of contracts for this cause.

The case at bar is the first of the kind that has come before a court of admiralty, but it is as striking a one as could be imagined or invented. It is one in which one party to the bargain has knowledge of a fact which, if known to the other, would have prevented the making of the contract. The ignorance of the fact on the part of the second party is one which cannot be made a subject of controversy, and this ignorance was known to the party suing upon the contract. To give him the benefit of it, to the injury of the claimants, would be, in our opinion, a startling violation of the fundamental principle of all law, that equity is equality. We think that the agreement between the masters of the two vessels, made in the case at bar, is infected with all three of the vices just stated, and is, therefore, not within the doctrine of caveat emptor. It must, therefore, be declared void under the principle that requires good faith in mutual dealings.

1. Without placing as much stress upon the point as upon the other two, we yet think it may be fairly held that in telling a part, but not the whole, of the truth to Capt. Strickland, Capt. Lomm was guilty of that suppressio veri which the law calls fraud. By this concealment he induced the former to make a contract which was contrary to the wishes and intents of his owners, who had already made with another a more favorable bargain,—a contract that he would not have made had the facts been fully disclosed.

2. The relation of salvor and saved, while not one of the fiduciary relations generally referred to in the law books, and accurately defined, as well as classified, is yet a fiduciary one. This will be readily apparent when we remember that in a large number of cases of salvage, particularly the earlier ones, the salvor has actually been in possession of the property saved, holding it for the lien which maritime law gives, and liable as trustee to the owner after the receipt of salvage. Besides this reason, another is to be found in the special confidence resulting from the very nature of the services rendered. We think special confidence as much belongs to the relation between salvor and saved as to that between insurer and insured.

3. Were the other reasons of declaring the contract void absent, we should unhesitatingly do so on the third ground, viz. because the parties were not dealing on terms of equality. There was on the part of Capt. Lomm an intentional suppression of a material fact, in relation to which he was informed, while Capt. Strickland had not access to any means of obtaining information of it. Looking at the position of the two parties to the bargain from another point of view, there appears to have been a striking inequality between them. The master of the Clandeboye had, when the Dauntless arrived at Stranger's Cay, been for nearly four weeks in a disabled vessel. He had lain helpless at his anchorage for 11 days. His only assistant, who was a navigator (the mate of the vessel), was absent, and he was alone in authority over the Clandeboye. He was suffering from the pressure of anxiety, responsibil-

ity, and delay. The master of the Dauntless, aware of all the circumstances, intent solely upon gain, fresh from home, with a mind disengaged and at ease, had an unfair advantage over him. In the short period during which he considered and agreed to accept the services proffered to him, Capt. Strickland can hardly be supposed to have had the time or grasp of the facts that would have enabled him to have drawn all the inferences from the fact of his mate's opportunities in Savannah that have been imagined by counsel. During that hurried interview between the masters of the two vessels, it doubtless confusedly occurred to the master of the Clandeboye that his mate was trying to do something for him, and that tugs would be at hand in a short time, prepared to tow him somewhere. Probably he thought of the nearest ports. His conversation shows that thoughts of this kind were in his mind. He was anxious to get away, and with the words "first come, first served," he made terms with Capt. Lomm, whose tug had arrived first. But it would be unjust to suppose that he expected or had in his mind any thought of the possible existence of what was actually the fact, viz. a contract under which a powerful tug had been employed by his owners to tow him to the place to which he desired to be taken (Vera Cruz), and was already on the way to Stranger's Cay, near the Little Bahamas, where he was lying. We see no reason to doubt his statement that, if he had known of the employment of the Morse, he would not have employed the Dauntless. The parties were not dealing on equal terms, and their contract cannot be enforced.

While, however, the contract must be set aside, it does not necessarily follow that the libelant is entitled to no compensation. The question remains, of what, if anything, the Dauntless is entitled to for any net benefit actually received by the Clandeboye from her services. It would be inequitable to allow the latter to refuse to pay for anything of use actually received by her. Nor do we wish to extend to a new case the exaction of penalties in civil actions. In the actual condition and position of the Clandeboye when taken in tow by the Dauntless she needed two things,—repairs, and the opportunity of taking her cargo to Vera Cruz. If Capt. Lomm had not interfered, she would have been towed to Vera Cruz by the Morse at an expense, including cost of taking her mate and three seamen from Tybee, of $5,200. Upon arriving at Vera Cruz, she could have discharged herself of her cargo, but could not have been repaired, owing to the fact that there are no facilities there for docking vessels. It would therefore have been necessary to have taken her to some port possessed of such facilities. New Orleans, Pensacola, and Newport News have been suggested. The former places are nearer Vera Cruz than Newport News, but the latter is understood to have very superior facilities of the kind needed. The Dauntless rendered a real service to the Clandeboye in towing her to Newport News, where she could be docked. After being repaired, it became possible for her to proceed to Vera Cruz under her own steam, but it seems probable from the testimony that, had she been towed to Vera Cruz in the

first instance, she would have been compelled to take a tug in her journey to a dry dock. This expense she has been saved. In addition to this, she was saved by the Dauntless from the perils of a four-days longer stay at her anchorage. On the other hand, at Newport News she was put to the expense of unloading and reloading 1,500 tons of her cargo, which is stated by Capt. Strickland to have been $1,200. The captain also states that the time occupied was 16 days, and estimates demurrage at £45 per day. From this demurrage there ought to be deducted the four days' time saved her by the Dauntless in taking her from Stranger's Cay before the arrival of the Morse. I suppose, too, that the demurrage is estimated at charter-party rates, and is excessive. I should be disposed to allow $1,700 for it. The amount lost to the owners of the Clandeboye by their obligations to the owners of the Morse was $1,900. The total on this side, as I estimate it, would be $4,800, besides costs of steaming from Newport News to Vera Cruz. Against this is the saving of the $5,200, which was to have been paid for the services of the Morse, the cost of taking the Clandeboye from Vera Cruz to a port with docking facilities, which would have been necessary had she been towed to Vera Cruz before being repaired, and the benefit to her of her earlier rescue from the perils of her position on the coast of the Little Bahamas. On the whole, the court allows $1,000 as the net gain to the owners of the Clandeboye for the services of the Dauntless.

Decree modified, and rendered in favor of the libelant in the sum of $1,000.

GOFF, Circuit Judge. I agree with the court that the agreement made by the masters of the Clandeboye and the Dauntless must, under the circumstances shown to have existed at the time it was entered into, be declared void, and that it cannot be enforced in a court of admiralty. I do not concur in that part of the opinion that allows the libelant compensation for the services rendered by the Dauntless, undertaken, as they were, in bad faith, with a fraudulent purpose, and the intention of suppressing the truth, thereby taking advantage of a vessel, if not in danger, at least in distress, and causing its owners an additional and unnecessary expense. In a case of this character a court of admiralty is a court of equity, and a party who asks its aid must come before it with clean hands, and with such facts as will, ex aequo et bono, show a case proper for its interposition. If the salvors have been guilty of misconduct or of negligence, or have been in collusion with the master, or have attempted to take advantage of the unfortunate, they have thereby forfeited all claim for compensation even for services actually rendered. The Boston, 1 Summ. 328, Fed. Cas. No. 1,673; The Byron, 5 Adm. Rec. 248, Fed. Cas. No. 2,275; The Lady Worsley, 2 Spinks. 253; The Bello Corrunes, 6 Wheat. 152; Marvin, Wreck & Salv. § 222; Jones, Salv. 124; Cohen, Adm. Law, 171.

The undisputed facts of this case show it to be at least most peculiar, the books containing nothing similar to it, and in my judgment the courts should not aid in duplicating it by tolerating

such litigation. I think that the decree of the dist: ct court should be reversed, and the cause remanded, with directions that the libel be dismissed, and that the claimant recover all costs.