## THE STANLEY H. MINER.

(District Court, E. D. New York. August 4, 1909.)

1. CONTRACTS (§ 93*)—WORK AND LABOR (§ 10*)—VALIDITY OF ASSENT—MUTUAL MISTAKE.

Where two parties enter into a contract to perform specific work, neither having knowledge of the facts actually existing, and the contract proves to involve work essentially different from that which the parties had in mind, it will not be enforced by a court; but if the work is proceeded with after knowledge of the facts, under circumstances from which a contract may be implied, a recovery may be had therefor on a quantum meruit.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 415; Dec. Dig. § 93;* Work and Labor, Cent. Dig. § 25; Dec. Dig. § 10.*]

2. ADMIRALTY (§ 1*)—JURISDICTION—SUIT INVOLVING EQUITABLE ISSUES.

A court of admiralty may entertain a suit for salvage, in which the claimant pleads a contract under which it is alleged the services were performed, but which libelant seeks to avoid on the ground of fraud or mistake; such court having equitable jurisdiction, in the sense of applying rules of equity to questions incidentally arising in a suit within its general jurisdiction, at least where no objection is made prior to the hearing.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 1; Dec. Dig. § 1.*

Jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347; Boutin v. Rudd, 27 C. C. A. 536.]

3. SALVAGE (§ 36*)—CONTRACTS AS TO COMPENSATION—VALIDITY.

Claimant purchased a wrecked schooner, lying on her side, partly submerged in Cape Fear river, and contracted with libelant, through its representative, who made an examination of so much of the vessel as could be seen, to raise, pump out, and deliver her and her cargo in New York for the sum of $3,750. On righting her, it was found that the underside, on which she lay, and her keel, were seriously damaged, necessitating quite extensive repairs before she could be pumped out and towed. Libelant notified claimant of such facts, stating that it would do the work, but should expect additional compensation, to which claimant replied, in ef-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

fect, that he considered the contract binding. Libelant delivered the vessel in New York at an expense largely exceeding the contract price, and brought suit to recover as for a salvage without contract. *Held* that, as no fraud, misrepresentation, or concealment of known facts was shown on the part of claimant, but both parties contracted with reference to what appeared from inspection, both were bound by the contract, and, the services rendered by libelant being within its terms, there could be no recovery therefor beyond the contract price.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 87; Dec. Dig. § 36.*]

In Admiralty. Suit for salvage.

Robinson, Biddle & Benedict (E. G. Benedict, of counsel), for libelant.

Hagen, Goodrich & Coughlan (Henry W. Goodrich, of counsel), for claimant.

CHATFIELD, District Judge. The four-masted schooner Stanley H. Miner was sold by the United States marshal at Southport, N. C., as she was lying upon the shoals opposite Battery Island, in a part of the Cape Fear river where the ebb tide runs with exceeding swiftness. This sale was had in a salvage proceeding, and at the time of sale a considerable portion of the deck load of lumber carried by the schooner had been removed to a lighter, but was sold with the schooner as if a part of her cargo. It appears from the testimony in this case that the vessel had been wrecked outside of the Capes, and when brought in by the pilots, claiming salvage, had been left, and had remained in the possession of the marshal, in an upright position, but with her deck load and rails awash. Between the time of her arrival and sale by the marshal, the effect of the mud coming down the river, and of further settling upon the bottom at low tide, was to cause the vessel to careen to starboard, and when prospective bidders at the time of sale attempted to make a visual inspection, as she lay upon the mud flats, they were able to examine above water a portion of the port side alone. The starboard rail was under water several feet, and the masts stood at an angle of about 45 degrees from the horizontal. In this condition, and with nothing more than a superficial examination of all above water, which was uninjured, except for a slight break near the bow, the claimant secured the vessel by a bid of $10,100, and is shown by the testimony to have bought the vessel from the appearance of her port side alone; it being said by the witnesses to follow, in 99 cases out of 100, where no collision or similar accident has occurred, that in a vessel wrecked by a storm one side will be injured substantially no more than the other.

The claimant is an extensive shipowner, with a great deal of experience in purchasing, repairing, and rebuilding sailing vessels. He says in his testimony that he has owned shares in more vessels on the Atlantic Coast than any other man in the United States for within a period of 15 years, and has made greater personal inspection of such repairs than probably any other owner of vessels during a like period. It appears from the testimony that immediately after the purchase of the vessel he arranged by telephone for the services of a diver, one

Smith, who arrived at Southport within a few days and went to work, as he and claimant's witnesses say, to examine the condition of the vessel under water, and to patch up what he found. This diver describes the muddy condition of the water and the difficulties of the current, which rendered work during ebb tide substantially impossible, and states as his method of operation a progressive system of inspection, with attempts at repair as fast as he found anything wrong, rather than a complete survey of the vessel before going to work. An uncle of the claimant, one Guilford Pendleton, was sent for from his home in Maine, and upon his arrival was put in charge of the operations and work of the diver, pending a trip of the claimant to New York, from which he returned upon Monday, the 27th day of May, 1907. Upon his arrival he obtained a report from his uncle and from the diver of what had been found and done, namely, that the keel of the vessel was missing from the sternport, which was in place, to a point where the deadwood terminated at the junction of the timbers with the keel of the vessel; that from the stem for some 18 or 20 feet aft the keel was missing, and that this had been patched with canvas and timbers; that for some 75 feet aft of this point the keel was present; that the injuries upon the port side had been temporarily repaired; that nothing had been done on the starboard side; and that the vessel had gone over substantially flat upon her beam ends the night before in a storm.

The result of this consultation seems to have been a determination upon the part of the claimant to immediately proceed to right the vessel as a step necessarily precedent to pumping out. The diver in his testimony states that righting was the next step which had to be taken, inasmuch as it was impossible to get at the starboard side while the vessel rested upon the bottom, and that it was also inconvenient and inadvisable to attempt to then do anything more to the keel, which could not be reached without staging. It also is stated by the claimant and by the diver that they reached the conclusion (from an inspection of the keel, showing it to be substantially intact for a further distance of some 70 feet aft of the break near the stem, and from the fact that the deadwood, and as the diver reported, part of the keel, was present at the stern) that the rest of the keel would be found in place and would not require much repair before the vessel should be hauled out upon the dry dock. The river at the point in question is said to have been so muddy that the diver could see nothing, but was dependent entirely upon what he could learn by investigation with his hands, and his testimony agrees with that of the claimant to the effect that no inspection was made by him, nor reported by him, as to the actual condition of the keel for the 60 or 70 feet remaining.

The claimant proceeded to Wilmington, N. C., some 25 miles up the Cape Fear river, on Monday night, the 27th of May, got into communication with the revenue cutter Seminole and with the Astral, a large tug belonging to the Standard Oil Company, obtained the services of the lighter upon which the deck load had been piled, and two small tugs belonging in the neighborhood, and arranged to have them at the wreck as soon as possible, where they were all to give assistance, including the Seminole and the Astral, if soundings showed that they

could get in a position to aid in an attempt to right the vessel by ex-erting force with tackle upon her masts, and by raising these masts upon lighters. In fact, some attempt was made to do this with the boats at hand upon the Monday when the claimant was at the wreck; but the power was insufficient to accomplish anything. While at Wilmington the claimant also succeeded in getting in communication with Capt. Tooker, superintendent of the Merritt & Chapman Derrick & Wrecking Company, at Norfolk, the Southern headquarters of that concern, with the result of getting him to leave some work in the Chesapeake region and to proceed to Southport to assist in the operations, under an agreement that his compensation would be determined later. Capt. Tooker joined the claimant at Wilmington upon the evening of Wednesday, May 29th, and they proceeded together upon one of the boats to Southport, where they arrived at about 2 a. m. Thursday, the 30th. On this morning the various vessels above named were preparing to proceed with the operation of raising the vessel, were arranging their hawsers and taking soundings, when the claimant and Capt. Tooker proceeded to the schooner, and both climbed upon the projecting port side, where, in the presence of Mr. Guilford Pendleton, one Weeks, and the diver, Smith, an examination of the situation was had, and the claimant entered into a negotiation with Capt. Tooker, upon the suggestion of Capt. Tooker that the Merritt & Chapman Company contract with the claimant to raise the vessel and deliver her at New York under a contract. The conversation with respect to this is testified to by both the claimant and Capt. Tooker, and some portions of the conversation were heard by the witness Weeks. Capt. Tooker also talked with the diver, Smith, and with Mr. Guilford Pendleton, and the result was that Capt. Tooker made a proposition of $10,000 for the contract, which offer was refused by the claimant, and both men started ashore. Later further negotiations were had, resulting in an offer by Capt. Tooker to do the work for $4,000, and by the claimant to give $3,500, and an ultimate agreement to split the difference. Thereupon both men proceeded ashore and to a grocery store, where a contract was written by the claimant upon a sheet of paper, which agreement was signed by the claimant and by Capt. Tooker for the Merritt & Chapman Company, and which is as follows:

"Memorandum of agreement between Merritt & Chapman Derrick & Wrecking Co., of the first part, and F. S. Pendleton, of New York, owner of the Schr. Stanley H. Miner and her cargo, to wit: The said party of the first part agrees to raise the said Schr. Stanley H. Miner, pump her out, and deliver her, hull, tackle, apparel, and fittings, together with her cargo of lumber now on board of her, at New York or Phila. for the lump sum of thirty-seven hundred and fifty dollars ($3,750.00) in cash, payable upon proper delivery of vessel and cargo at either New York or Phila. Port of destination to be named by party of the second part when vessel is ready to leave Southport."

Capt. Tooker then directed that claimant call off the various vessels which were present, and the Merritt & Chapman Company took charge of the wreck, succeeded in righting the vessel, suspended her alongside a Merritt & Chapman Company boat, and proceeded up the river to Wilmington, in order to obtain a satisfactory berth where further work could be done. The result of this work and of the injuries then found caused the writing of a letter, upon the 17th of June, 1907, by

the Merritt & Chapman Derrick & Wrecking Company, to Messrs. Pendleton Bros., 130 Pearl street, New York City, as follows:

"Schooner Stanley H. Miner.

"Gentlemen: Our agent, Capt. Tooker, has contracted with you to right, pump out, and deliver, either Philadelphia or New York this vessel, which was on her beam ends at Southport, N. C., for the sum of three thousand seven hundred and fifty ($3,750.00) dollars. The statement of the diver employed by you, together with the statement made by yourselves, was to the effect that the bottom of this vessel had been patched and made tight, and it was only necessary for us to right the vessel, pump her out, and deliver. In pursuance of this arrangement and understanding, the work was commenced and the vessel righted. It was then discovered that she would not pump. The examination by our own diver then revealed the fact that 18 ft. of the vessel's keel was entirely gone, that the rudder was broken off, and about one-quarter of the deck load on lee side mixed with sand, mud, and rubbish. These conditions have entirely changed the character and extent of our work, and it has become necessary for us to patch the parts under water and remove balance of deck load, which had not been done by those employed by you, at consequent great expense and delay. Notwithstanding our discovery of so much additional necessary work to float the vessel, our agent is instructed to proceed with this work; but we must notify you that in consequence of these conditions we must hold you for the extra expense incurred. We are advised by our people now at work upon the wreck that it will require at least two weeks to complete the work of getting the vessel ready for towage to sea."

Pendleton Bros. replied upon the 25th of June, 1907, in the following language:

"Merritt & Chapman Derrick & Wrecking Co., New York—Gentlemen: Replying to your favor of the 17th, which came while the writer was away, beg to state that we made a contract with your Capt. Tooker to deliver the vessel at New York or Phil. We made no guaranty of condition of vessel. Capt. Tooker was on board the vessel, looked her over, and talked with the diver, whom he had known for years. The writer did not know anything about the vessel's bottom; but Capt. Tooker expected to need the services of a diver in floating her, because he first engaged Mr. Smith, the diver whom we employed, to stay. Then Mr. Smith decided to return home, and Capt. Tooker sent to Norfolk for a man. I inclose herewith a copy of our contract with Capt. Tooker. We hope you will not have the trouble you anticipate, and trust it will prove a profitable job."

The Merritt & Chapman Company continued, after this interchange of letters, to get the vessel into a condition in which she could be towed, and successfully brought her to the Morse Dry Dock, New York Harbor, where upon arrival she was for the first time hauled out of water and placed in a position where her starboard side and keel could be properly examined, with a result that the entire keel was found to be missing for some 22 feet forward of the deadwood at the stern, and a substantial injury, which required the replacing of several planks and two frames, was found upon the starboard side of the vessel. The amount expended upon the job by the Merritt & Chapman Company was shown by the testimony to be $13,800.22, and, while this evidence was objected to by the claimant, both as to its relevancy and materiality, and also as to the method of proof, nevertheless no question was raised as to the correctness of the figures, and inasmuch as the claim of the libelant is for salvage, and not for the actual amount expended, it is considered that the testimony may be used for the purpose of determining the exact issues in the case.

A diver, Jacobson, testified at the trial that he had been in the employ of the Merritt & Chapman people at Wilmington; that he found that the keel immediately forward of the deadwood (but 18 feet from the sternpost) was missing for some 20 feet, leaving a space where he could thrust his arm up between the frame of the vessel. This injury, and also the extensive break upon the starboard side of the vessel, were discovered while the boat was at Wilmington, and just before the writing of the letter of June 17th above set forth. It is evident that the condition of the keel must have been the basis of discussion at the time the contract was entered into between Mr. Pendleton, the claimant, and Capt. Tooker, for Tooker asked some questions as to what had been learned of the keel. But there is no claim on his part, or on the part of any other person, that he ever sought information as to the starboard side of the vessel, which was down upon the mud at the time the contract was made. The injuries to the keel were much more extensive than had been anticipated, and caused a great deal of the extra expense and work necessary to raise the vessel and get it to New York. But the great injuries to the starboard side also caused a large outlay for work and repairs, and it is hardly possible to determine how much of the increased expense was due to the unknown injuries to the keel, and how much to the injuries on the starboard side, which were certainly a part of the risk taken by the libelant in making the contract.

But it is claimed by the libelant, as a basis for the entire action, that fraud was present, and that the contract itself was thereby vitiated, or void ab initio, or that there was a mutual mistake of fact, in that it is argued that neither Capt. Tooker nor Mr. Pendleton knew of the conditions which were subsequently found, that both depended upon the representations which had been made by the diver, Smith, and that both were dickering for definite services upon the assumption that the only work necessary was to right the vessel, pump her out, and tow her to New York. There is no evidence in the case as finally submitted to indicate deliberate fraud. Capt. Tooker says he was told that the keel was all right so far as they knew. Pendleton had no information at all as to the injuries found, and Smith shows in his testimony later that both the work upon and examination of the vessel only progressed to a certain point, when she was thrown over by a storm into such a position that no further work could be done in that locality until she was righted. In fact, Smith testifies that the vessel was not ready to pump out, but that he and Mr. Guilford Pendleton both agreed that the diver's work should stop until the vessel could be brought into an upright position and into a better place for work.

It can be assumed as a premise that where two parties are entering into a contract to perform specific work, and neither of the parties has knowledge of the facts actually existing, and a contract results which proves to be an agreement involving matters essentially different from the work which the parties had in mind at the time, no agreement can have been reached as to the real contract involved, and hence the agreement which was entered into would not be enforced by a court. The reason for this is that the parties' minds have not come to an

agreement about the matter, which proves to be the subject of the contract, and in such cases either party would be relieved from performance if the mistake were discovered in time. Where the court allows such a contract to be pushed to one side for such a mistake of fact, and where an implied contract can be substantiated, quantum meruit may be made the basis of recovery, if the remedy be pursued in the proper manner and unjust enrichment can be shown.

In the present instance the libelant has claimed a reward for salvage services in uprighting, repairing, pumping out, raising, and towing the Miner to New York City. It has alleged and shown that she was in a wrecked condition, and has based its claim for salvage upon evidence which might have been presented if the facts had allowed a quantum meruit claim. The claimant has answered by setting up a contract which he alleges covered the same services. The libelant has then, in a reply, endeavored to interpose a release from any liability upon the contract, or, rather, an affirmative defense that the contract was never binding, and has reaffirmed his right to recovery for what he did in the way of salvage. It may be incidentally noted that the claimant interposed an indefinite counterclaim for certain damages and delay; but no evidence of any such cause of action was shown, and this can be disregarded in the case. The issue as thus framed was answered "Ready," and upon the trial the claimant moved to dismiss on the ground that the libelant should have brought an action in equity to rescind or reform his contract and to recover upon an accounting, or that he should have brought his action in the state court for fraud and for damages, if he claimed the right to be released from the contract on that ground.

The pleading adopted by the libelant is similar to that approved by the court in the case of The Silver Spray's Boilers, 1 Brown's Adm. 349, Fed. Cas. No. 12,857, which calls attention to the fact that admiralty will take jurisdiction where an accounting is incident to the principal cause of action, citing The Emma B. (D. C.) 140 Fed. 771, and Benedict's Admiralty, § 263a. But, upon general principles of pleading, the parties seem to be properly before the court, and the court would seem to have jurisdiction. The libelant does not ask for damages, but for salvage. It has put in evidence the amount which it expended, not as a basis for computing the amount of recovery, but for showing the value of its so-called salvage service. The claimant has denied that the services can be taken out of the contract, citing The Elfrida, 172 U. S. 186, 19 Sup. Ct. 146, 43 L. Ed. 413, in which it was held that salvage contracts in general will be enforced, and not set aside, "unless corruptly entered into, or made under fraudulent representations, a clear mistake, or suppression of important facts, * * * or under other circumstances amounting to compulsion, or when their enforcement would be contrary to equity and good conscience."

An admiralty court has equitable jurisdiction, in the sense of applying rules of equity. As a matter of legal pleading, such an affirmative defense as was interposed by the libelant to the affirmative allegation of the existence of a contract is like the issue raised upon a

counterclaim, and even under code pleadings is recognized (section 514, Code Civ. Proc. N. Y.); and while an action to reform a contract or for an accounting based upon fraud may be equitable, nevertheless fraud itself is a valid defense, and the court can see no reason why the issue presented in the present action could not be disposed of properly. But in any event the court had jurisdiction of the parties, of the vessel, and of the claim set up by the libelant. The point was apparent upon the pleadings, and, inasmuch as it does not seem to absolutely oust the court of jurisdiction to try the salvage claim, would seem to have been waived by bringing the case on for trial before any objection to the action of the court was made. We must therefore return to the issue shown in the testimony, and decide whether the libelant was relieved from the performance of the alleged contract which it admittedly entered into, and whether such a mistake of fact existed as would compel the court to consider the contract void ab initio.

But first it must be noted that the libelant has urged that the contract is void, not only because of the charge of intentional fraud, but in that the claimant is said to have made representations which he intended to be taken as true, which were in fact not true, and by which he must be held bound to an equal extent as if he had known them to be false at the time. An examination of the testimony, however, shows that anything of this nature was merely in the way of argument or inducement, and was merged in the written contract, and the testimony of the libelant's witnesses themselves, especially that of Capt. Tooker, negatives the idea that positive statements were made by Mr. Pendleton which could be construed as guaranties, or propositions of what he asserted were facts, rather than inferences from the conditions which were apparent. No statements false in fact, or concealment of matters known to the claimant, have been shown, which would bring the case within the doctrine of The Kingalock, 1 Spinks. 263, or The Clandeboye, 70 Fed. 631, 17 C. C. A. 300.

But as to the actual statements of fact upon which the contract was made, and as to the assumptions on the part of each party to the negotiations as to the work to be done, a somewhat different situation exists. If the contract had been entered into, upon the request of the claimant or the offer of the libelant, to perform certain specific acts, and it had been proven that other work was necessary and that a different condition of facts existed, the parties would seem to have entered into the alleged agreement under a mistake of facts upon which the agreement was based, and would have been justified in notifying the claimant that a contract to do what was required had never been made, and would then have been in a position to claim salvage, or to force a new agreement for the work yet undone, with compensation for what had been expended. But in the present instance both parties were viewing the situation from what they knew and could ascertain by inspection.

It is impossible to hold that either the diver or Mr. Pendleton made a definite statement that the entire keel had been inspected, in view of the testimony of the various witnesses as to just what the diver had

done, and the condition of the keel from about amidships back aft to the beginning of the deadwood was a matter of opinion, as was also the work necessary to make the starboard side tight enough to raise the vessel by pumping. This side proved to have the seams open and to have a number of planks thrust out or injured, and yet the work necessary upon this side was certainly included in the proposition to raise, pump out, and deliver the vessel. Capt. Tooker began his negotiations with the proposition to take the contract for $10,000, Mr. Pendleton offered $1,500, and the entire negotiation was based upon speculation, rather than upon a definite estimate of performing certain services. Any amount of persuasion and argument, based upon the fair appearance of the port side and the injuries which the diver had discovered, were inducements as to which Capt. Tooker assumed the risk, and which were merged in the contract, which he made to cover everything necessary in raising, pumping, and delivering the vessel.

The libelant, therefore, must be restricted to the admitted liability of $3,750, and with interest, inasmuch as no tender was made, even though its recovery has been delayed by its own suit. Upon the entire case, however, and in view of the natural deductions of the libelant prior to the taking of testimony in court, no costs to either party will be awarded.