## THE HUNTER.

*(District Court, D. California.   January 22, 1886.)*

**1. SEAMAN—"LAY" ON WHALER—EVIDENCE.**
  A shipwrecked seaman was taken on board a whaler in the Arctic ocean. The master did not put the seaman's name on the shipping articles, as he was requested to do, and he testifies, without corroboration, that the lay allowed the seaman was 1-170.  The latter told the master that his lay on the wrecked vessel was 1-100, when it was in fact 1-125; but he testifies that the master believed him, and allowed him 1-100, which is corroborated by the engineer of the wrecked vessel.  It was admitted that shipwrecked seamen taken on board in the Arctic ocean usually receive a higher lay than those shipped at the commencement of the voyage.  *Held*, that the seaman was entitled to a lay of 1-100.

**2. SAME—OFFSET—EVIDENCE.**
  In a libel of a whaling vessel for a seaman's lay in the bone and oil taken, the master sought to establish an offset for a pair of boots furnished libelant.  He produced no books of account containing entry thereof, and his evidence was uncorroborated, while libelant denied that the boots were furnished him.  *Held*, that the claim should be disallowed, as it was in the nature of a counter-claim, and required a preponderance of proof to establish it.

**3. SAME—DISCHARGE.**
  When a seaman was not discharged or expelled from the vessel against his protest, but left it under a mutual agreement with the master in consequence of their disagreement, he is not entitled to share in oil and bone taken after he left the ship.

In Admiralty.   Libel *in rem* by a seaman to recover his lay in the oil and bone taken by a whaling ship.

*J. D. Sullivan*, for libelant.

*Wm. H. Cook*, for claimants.

HOFFMAN, J.  The proofs, I think, show that the libelant was engaged at a lay of the 1-100.   He so swears himself, and he is corroborated by the testimony of Mr. Russell, who was engineer on board the ship-wrecked vessel Rainbow, from which they were received with others of the crew of the latter.   At the time of his shipment, in answer to the master's inquiry, he said that his lay on board the Rainbow was the 1-100 lay.   In fact it was the 1-125 lay, but the master believed his statement, and agreed, as he alleges, to take him on the same lay.   It is admitted that shipwrecked seamen taken on board a ship in the Arctic ocean usually receive a higher lay than that allowed to crews shipped at the commencement of the voyage.   The master swears the lay was the 1-170 lay.   He is wholly uncorroborated.   The preponderance of proofs, therefore, as well as the probabilities of the case, indicate that the lay was the 1-100.   All doubt, however, might have been removed if the master had put the man's name on the shipping articles, which he omitted to do, though, as the libelant says, he often requested it.

The "hail" of the master on his arrival, stating the catch to be 280 barrels of oil, is proved to be erroneous.   The oil actually taken was 309 barrels.   The libelant is, of course, entitled to have his account settled upon the basis of the actual catch of the vessel.   As far as I can ascertain from the testimony, the crew are not entitled, unless specially stipulated for, to any lay in the "trade bone;" that is, bone obtained from the natives by barter.

I am inclined to think that the libelant cannot claim any share in the oil and bone taken after he left the ship. He does not appear to me to have been discharged; that is, expelled from the vessel against his will or protest. A disagreement occurred between him and the master, at which both seemed somewhat irritated. They seem to have parted by mutual consent. Under the special circumstances of this case, the recovery of the libelant must be limited to his lay in the oil and bone taken while he was aboard. Some of the oil taken from the dead whale seems to have been of an inferior quality. The bone was shipped to New York for sale, there being no market for it here. The freight and incidental expenses of conveying it to a market and selling it must be deducted from its proceeds, or its value, (if not sold.) A tabular statement is appended, drawn up in accordance with these views, and showing the amount and value of the oil and bone on which the libelant is entitled to the 1-100 lay. I have added 10 per cent. to the cost price, so far as I can ascertain it, of slops furnished to the libelant. I have disallowed a charge against him of three dollars for a pair of boots The master swears they were furnished, but produces no books of account The libelant denies that he received them. I am inclined to suspect that they were furnished to him, but the claim of the master is in the nature of an offset or counter-charge to the demand of the libelant He is bound to establish it by a preponderance of proof. As between his assertions and the libelant's denial, I must accept the latter. If the master of a vessel proposes to charge the seamen with supplies of this nature, he should set each item down at the time it was furnished in an account-book kept for the purpose, the entries in which he can verify by his oath The libelant is entitled to a decree for the sum of $48.20, together with costs

### SCHEDULE.

The amount of oil obtained from the two whales taken while libelant was on board I find to have been, - - - 5,435 gals.
The amount of bone obtained from the whales taken while libelant was on board I find to have been, - - - 3,090 lbs.

I allow as the value of the oil, for the purpose of ascertaining libelant's share of the catch, as follows:

| | |
|---|---:|
| 1,800 gals. oil, @ 18c. per gal., | $ 324 00 |
| 3,635 gals. oil, @ 25c. per gal., | 908 75 |
| And for the value of of the bone as follows: | |
| 3,090 lbs. bone, @ 1.75 per lb., | 5,407 50 |
| Total value of catch, | $6,640 25 |
| The 1-100 lay of which would be, | $ 66 40 |
| I have allowed slops, @ $18.20, | 18 20 |
| (Disallowing charge for boots,) | |
| Due libelant, | $ 48 20 |