Fred I. PUTNAM and James A. Overman, Appellants,

v.

Harry C. LOWER, John Kadlec, George S. Herning, Edgar L. Peecher, William E. Barquist and Norman L. Bunker, Appellees.

No. 14645.

United States Court of Appeals Ninth Circuit.

July 30, 1956.

Peyser, Cartano, Botzer & Chapman, Seattle, Wash., William H. Botzer, for appellants.

M. Bayard Crutcher, Bogle, Bogle & Gates, Seattle, Wash., for appellees.

Before STEPHENS, POPE, and FEE, Circuit Judges.

STEPHENS, Circuit Judge.

Fred I. Putnam and James A. Overman, as holders of a valid recorded preferred ship mortgage on the oil screw vessel Silver Spray, her engines, tackle, apparel, furniture and equipment, bring this appeal from a decree of the district court for the western district of Washington, northern division, foreclosing said mortgage and subordinating it to the wage liens of appellees.

In May of 1954, Robert J. Tobin, owner and mortgagor of the Silver Spray, conceived the idea of conducting a tuna fishing venture in Southern California waters. Since he lacked the necessary funds to outfit such an operation, he placed advertisements[1] in the Seattle Times, and other Northwest Coast papers, seeking persons to invest money on a working share arrangement or fishing lay.[2] In this manner, Tobin contacted appellees Lower, Kadlec, Herning, Peecher and Barquist, and represented to them that he was the owner of the Silver Spray, which was an 80' tuna clipper, and either was or would be equipped with live bait tanks and refrigeration, in order that it could leave Seattle for San Diego by May 15, 1954, to fulfill a tuna fishing contract with the Van Camp Sea Food Company. Induced by these representations, appellees Lower, Herning, Peecher, each paid $2500 for a working one-tenth share on the Silver Spray.[3]

Appellee Kadlec did not sign a share agreement, but was employed by Tobin as a crew member of the Silver Spray for a wage of $100 per week.

---

1. Typical is Exhibit 3: "Commercial Fishing. Tuna Boat leaving for Southern Waters, $2500 required. No investment risk. Must be dependable. Write 17-40 Times."

2. Used in this sense, the word "lay" means a share of the profits of a venture given in lieu of wages. Such an arrangement is traditional in the whaling, sealing, and fishing trades. For a detailed explanation of the operation of the "lay" system, see: O'Hara Vessels, Inc., v. Hassett, D.C. Mass.1942, 60 F.Supp. 672; The Dirigo First, D.C.Mass.1945, 60 F.Supp. 675.

3. The agreement of the parties was embodied in the "Working Share and Contract on Tuna Clipper Silver Spray Owned and Operated by R. J. Tobin", executed by each of the appellees, wherein it was provided:

"This Agreement made and entered into this......day of............1954, by and between R. J. Tobin, hereinafter termed party of the first part, and...... hereinafter termed party of the second part, provides that—

"1. In consideration of the sum of $...... paid by the second party, the first party agrees to sell one working share in the fishing boat............ owned by the first party.

"2. The first party shall furnish all fuel, food, gear, and second party shall work under orders of first party or whomever the first party shall designate as Captain.

"3. All boat movement and fishing operation shall be controlled by first party.

In mid-May, 1954, Tobin informed the crew that the Silver Spray would go to Alaska to haul a load of shrimp. This was to be in the nature of a shakedown run for the vessel and crew. While it appears that many of the appellees had secret objections to such a venture, none were voiced, and on May 18, 1954, the Silver Spray left Seattle for Wrangel, Alaska. In some unexplained way the shrimp, which were to be taken aboard, were gone when the vessel reached Wrangel, and Tobin subsequently left the boat at Ketchikan and returned to Seattle with appellee Peecher, whose health was adversely affected by the cold northern weather. Thereafter, Tobin sent a wire [4] to the Silver Spray directing its return to Seattle to make ready for the voyage south.

On June 2, 1954, appellee Bunker agreed to captain the Silver Spray on its fishing expedition. The following day the vessel arrived in Seattle from Alaska. It appears that during the interim, Tobin had been making efforts to secure bait and refrigeration equipment in order to outfit the Silver Spray for tuna fishing. It became necessary to dry dock the ship for repairs, and during this time Tobin left town on personal business. Provisions were growing short and the affairs of the fishing lay were in a confused state, which does not appear to have been caused by any of the appellees. As a result, on June 10, 1954, appellee Lower libeled the boat, her engines, tackle, apparel, furniture and equipment, and Tobin personally; setting out in his libel many of the above facts. It was alleged this was a cause within the admiralty and maritime jurisdiction of the court; that Tobin had abandoned the vessel at Ketchikan, Alaska, and had since refused to repair it or provide it with the necessary provisions or funds to carry out the tuna fishing venture. It was further alleged

"4. The location of the fishing operation shall be in southern waters or wherever designated by party of the first part.

"5. The boat...........shall carry ............working shares to be divided as follows: one-half to the boat owner or party of the first part, and one-half to the crew who are shareholders.

"6. In the event the party of the second part becomes dissatisfied with the working share he will give 30 days oral notice to party of the first part, which will enable first party to replace second party without hindering the operation of the boat.

"7. In the event the second party desires to sell his share in the boat, the purchaser must be approved by the first party.

"8. If the second party leaves or is dismissed from service, the first party will sell the working share for second party within 90 days of leaving the boat and give him full refund.

"9. If the second party leaves the boat of his own free will and volition, he shall pay his own expenses to the point of departure, viz., Seattle.

"10. If the second party proves unsatisfactory to the first party, the first party may terminate this agreement immediately, and the above conditions with regard to selling working shares shall then apply, provided, however, that if the first party terminates the agreement the first party shall pay the fare of the second party back to the point of departure, viz., Seattle.

"11. In the event party of the first part shall decide to go out of business, the boat and equipment will be sold and shareholders paid off..

"12. The party of the second part agrees to settle any difference with the first party and to arbitrarily do nothing whatsoever to hinder the operation of the boat and crew.

"13. It is further understood that the first party is not responsible for life or limb of second party, and the second party thoroughly understands the hazards and risks of the venture.

"14. This agreement by mutual consent of both parties may be made to apply to any other boat operated by first party insofar as he sees fit to adaptability of the second party.

"15. In Witness Whereof the parties have caused this agreement to be executed the day and year first above written at ................."

4. Tobin's wire of May 28, 1954, read as follows:
"Get ready to leave immediately for Seattle. Bring poles so can outfit for southern tuna. Call me Edmond Meany Hotel, Seattle, immediately."

that libelant was wrongfully discharged without fault on his part, and was entitled to the sum of $5,000 as the value of his share of the catch, had the venture been carried out.

On June 10, 1954, pursuant to the libel, the Silver Spray was attached and held by the United States Marshal. Substantially similar intervening libels were filed on July 26, 1954, by appellees Bunker and Kadlec, and by Doss R. Payne; and on August 26, 1954, by appellees Barquist, Peecher, and Herning. On August 26, 1954, appellants Putnam and Overman filed their intervening libel in rem and in personam against the Silver Spray, and against Tobin personally, setting out the admiralty jurisdiction of the court, and alleging the sale of the Silver Spray to Tobin for a $5,000 down payment and a $30,000 promissory note secured by a duly recorded preferred ship mortgage, and praying that the mortgage be foreclosed and adjudged superior to any liens the other libelants might have for shares.

Respondent Tobin answered the libels of appellees Lower, Bunker, Herning, Peecher, and Barquist, and as an affirmative defense set out the share agreement [5] and alleged that each of the libelants became dissatisfied with the proposed venture, but violated the agreement by refusing to give respondent the requisite 30 days notice of intention to withdraw from the venture, as required by paragraph 6 thereof. Appellees replied alleging that they were induced to execute the share-agreement by respondent's intentionally false representations that the Silver Spray was equipped to fish for tuna; that respondent was experienced in commercial fishing, and that he had a fishing contract with the Van Camp Seafood Company; and as a result the share contracts were null and void and of no effect. When the cause came on for trial, the trial judge found that on or before the date of the libel, Tobin by his actions had abandoned his contracts with libelants, abandoned the tuna fishing voyage for the 1954 tuna fishing season, and thereby wrongfully discharged libelants.

By the decree of October 28, 1954, appellees Lower, Herning, Peecher, Barquist, and Bunker were each awarded what the court termed "seamans' wage liens" of $7,500, less their respective earnings to the end of the 1954 tuna season. This award was based upon their probable share had the fishing lay been carried out.

Kadlec, as a salaried employee rather than a working shareholder, was awarded a lien for $495 for wages earned and unpaid.

Appellants, as mortgagees of the vessel, were awarded a lien of $30,725, together with attorney's fees of $2,500, superior in rank and prior in time to any and all maritime liens against the vessel, excepting the above mentioned wage liens, which were held to be superior in rank and prior to the lien of appellants' preferred ship mortgage.

Pursuant to said decree, a writ of *venditioni exponas* issued, under which the United States Marshal sold the Silver Spray, realizing only $11,000 from the sale. Inasmuch as this amount is inadequate to satisfy even partially their subordinated mortgage lien, appellants Putnam and Overman bring this appeal.

No appeal is taken by respondent Tobin.

Certain of the court's findings of fact are questioned. In this respect, appellants contend the court erred in finding that the libelant and intervening libelants were ready, willing, and able to continue performance of their fishing contracts, and that they were wrongfully discharged. In admiralty, as in other fields of the law, findings of the trier of fact will not be disturbed on appeal, unless the error is manifest clearly against the evidence.[6]

---

5. See footnote 3, supra.

6. The Kearney, 3 Cir., 1926, 14 F.2d 949, and cases at page 950. See, also, United States v. United States Gypsum Co., 1948, 333 U.S. 364, 365, 68 S.Ct. 525, 542, 92 L. Ed. 746: "A finding is clearly erroneous

■ There is no contention that Tobin formally discharged anyone; rather, the finding under attack finds its basis in Tobin's actions during the period from May 18, 1954, until the original libel was filed on June 7, 1954. It was the opinion of the trial court that by sailing to Alaska rather than to Southern California, by leaving the vessel at Ketchikan, by seeking to divert the enterprise to other grandiose schemes, by continuing to absent himself from the vessel, and by failing to provision it, Tobin had manifested his intention to terminate the proposed fishing lay, and thereby had wrongfully discharged appellees without fault on their part. There is, of course, no necessity that discharge be accompanied by formal words of firing. Words or conduct which would logically lead a prudent person to believe his tenure had been terminated are in themselves sufficient.[7]

■ The record shows that subsequent to his alleged abandonment of the vessel in Alaska, Tobin wired appellees directing them to return in order to start the tuna venture; that he had made inquiries regarding necessary bait and refrigeration equipment after his return to Seattle; that he had paid a drydock bill and had attempted to lift the libel by posting bond; and that as late as June 3, 1954, he engaged appellee Bunker to captain the vessel on the lay. Such factors could well support a position contrary to that reached by the trial court, but while we might have reached such a contrary result, had we initially heard the case, we cannot say the result reached by the trial court is clearly erroneous,[8] and hence the finding under attack must stand.

■ For the same reasons, the finding that appellee Kadlec was hired on a wage basis must be sustained. The testimony on this point was confused and conflicting, but the court heard the witnesses and observed their demeanor,[9] and there is substantial evidence to support the finding.

We are next faced with a jurisdictional question, it being the contention of the appellants that the causes of action asserted by the appellees are essentially common-law actions for fraud and deceit, and as such not cognizable by the district court sitting as a Court of Admiralty. This argument is founded upon the replies of the respective libelants to Tobin's affirmative defense setting out the share agreements. To avoid the effect of the share agreements, the respective replies admitted their execution, but alleged that they were induced by Tobin's false representations, and were accordingly null and void.[10] The argument is further buttressed by statements of certain of the appellees, elicited on cross-examination, in which they admitted that their original libel had been prompted by a feeling that Tobin had bilked

---

when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." See McAllister v. United States, 1954, 348 U.S. 19, 20, 21, 75 S. Ct. 6, 99 L.Ed. 20, an admiralty case.

7. N.L.R.B. v. Cement Masons Local No. 555, 9 Cir., 1955, 225 F.2d 168, and cases contained in footnote 9, at page 172 therein.

8. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525; see note 6, supra.

9. Henry v. United States, 9 Cir., 1954, 215 F.2d 639, and cases at page 641; Roberts v. United States, 5 Cir., 1945, 151 F.2d 664, 665.

10. Typical is the answer of appellee Bunker!—

"I.

"Admits that intervening libelant signed a purported working share and contract prepared by said respondent at Seattle, Washington, on June 2, 1954, and denies all remaining allegations of respondents' First Affirmative Defense.

"II.

"That intervening libelant had never served on a commercial fishing vessel, but held an unlimited master's license, and had considerable deep water experience as a merchant mariner, but no experience with, or knowledge about commercial fishing; that on June 2, 1954, and prior thereto, respondent represented to intervening libelant that he was the sole owner

them, and by a desire to recover their monetary investment.[11]

of a tuna fishing vessel called 'Silver Spray'; that said vessel was equipped to fish for tuna and that respondent had ample funds to successfully provide and maintain the venture, and that a crew was already employed on shares, including an experienced bait man and an experienced refrigerator man, two positions most important to the venture; that there was one vacancy on the crew, which vacancy was represented to be that of navigator; that intervening libelant was qualified to navigate said vessel. That respondent had entered into a contract with Van Camp Sea Food Co., Inc., to fish for tuna south of San Diego, California, for the 1954 season, using said vessel 'Silver Spray.' That said fishing company would operate a helicopter to assist in locating tuna fish; that respondent then planned and was prepared to take the vessel south to San Diego, leaving from Puget Sound on June 11 or 12, 1954, for the 1954 tuna fishing season; that said representations were made to intervening libelant for the purpose of inducing him to sign the aforesaid agreement, and intervening libelant agreed to work aboard said vessel for a tenth of the catch by virtue thereof.

"III.

"That the aforesaid representations by respondent were false, and were made by him with intent to deceive intervening libelant, so that said writing prepared by respondent, as aforesaid, and alleged by respondent in his answer herein, is null and void and of no effect. * * *."

11. On cross-examination, Lower testified:

"Q. I am inquiring of you. Do you now think that Tobin deceived you? A. Yes.

"Q. And the purpose of your lawsuit is to try to get back your $2,500 that he deceived you of? * * *. A. The purpose of my lawsuit is to get back—I had a contract to go to Greenland which amounted to $8,000, and the salmon—I mean the tuna for the summer which I lost, all the time I have lost, and everything I have lost I am trying to get compensation for it.

"Q. (By Mr. Corey) You are trying to get damages because you claim Tobin deceived you, is that right? A. Yes.

"Q. At the time you negotiated this contract with Tobin on April 17th and you put up $2,500, are you now claiming that Tobin told you the truth, or cheated you? A. Cheated me."

Herning was also examined on this point:

The trial court was not unaware of the implications arising from the above,

"Q. * * * Is it your claim, Mr. Herning, that you put up this $2,500 because Mr. Tobin misrepresented to you about this proposed trip and the availability of the boat for tuna fishing? A. That is right.

"Q. And what you are really complaining about is that he did misrepresent to you, got $2,500 from you, and you want to get it back, is that it? A. Well, I want to get back what I figure I have coming.

"Q. And that is the $2,500 you put up? A. That is right."

Peecher's testimony follows:

"Q. Now, in answer just a few minutes ago to a question asked you by Mr. Collins with reference to the occurrences on June 7, you said that on that date it was your disposition to punch Mr. Tobin in the nose? Was it because you felt that he had defrauded you? A. I had already made up my own mind that I couldn't believe a word the man said.

"Q. Well, did you think he had defrauded you in getting you into this deal? Was that it? A. I certainly did."

Barquist testified:

"Q. (By Mr. Carey): In what respect, Mr. Barquist, do you claim that Mr. Tobin misrepresented anything to you in connection with this proposed venture? A. Well, when we discussed it before I bought in, why he told me that we would make anywhere from $7,500 to $12,000 a year fishing tuna. That is what sold me on the idea, and he also stated that: 'All the contracts we have, we will lay them up here on the table where everybody can study them and read them over and vote on them.'

"Q. Do you claim those were misrepresentations that you relied upon? Did you believe him in other words? A. Well, I don't know what else they could have been, because none of them was ever carried out.

"Q. I am not asking about the carrying out end of it, but was it because of those representations he made to you that you advanced your $2,500? A. Yes.

"Q. And that is what you are complaining about? A. Yes."

Appellee Bunker was of a more independent frame of mind, as appears from the following exchange:

"Q. And do you think he misled you, deceived you? A. He deceived me in some respects, yes.

"Q. And that is what you are complaining about? A. No.

"Q. What are you complaining about?

and alluded to them in the course of the oral opinion.[12]

 If appellants are correct in their contention, and this is purely an action initially seeking affirmative relief for fraud and deceit, it is of course true that admiralty is without jurisdiction to hear the case. While admiralty courts are flexible in operation,[13] and are often said to act as courts of equity, it does not necessarily follow that they possess jurisdiction concurrent with that of equity, but rather that having once secured jurisdiction as an admiralty court, they may proceed in the trial of the cause on equitable principles.[14] Thus, admiralty "cannot entertain a bill or libel for specific performance, or to correct a mistake, * * * or declare or enforce a trust or an equitable title * * * or exercise jurisdiction in matters of accounts merely * * *."[15] Nor does admiralty have jurisdiction extending to actions seeking affirmative relief from fraud,[16] or seeking to set aside or reform contracts,[17] merely because there is a maritime flavor to the transaction. However, this is not to say that the mere entrance of fraud in any form into a case otherwise maritime, ousts admiralty of its jurisdiction. Whether the district court, sitting as a court of admiralty, has the power to hear and determine a given question, may well depend on how that question is presented in the case.[18] Although, as already mentioned, admiral-

A. I am complaining about the fact that Mr. Tobin wrongfully discharged me or abandoned me, and I am now seeking redress for that. * * *."

12. "It is possible that such libelant and intervening libelants also had on that day [June 7, 1954] a cause of action at common law against respondent Tobin for fraud and deceit or some other action at law, but on that date such libelant and intervening libelants were not required against their choice to sue upon such causes of action at law, and they did not do so.

"The mere fact that on cross-examination one or more or [sic] them may have given testimony tending to evidence a cause of action at law, does not in this case prevent the libelant from disavowing any request or intention of request for any relief in this Admiralty Court on any such cause of action at law, and each and all of such libelant and intervening libelants have effectually disavowed any such intent through their counsel, who have a right to speak for them."

13. Rice v. Charles Dreifus Co., 2 Cir., 1938, 96 F.2d 80, 83.

14. United States v. Cornell Steamboat Co., 1906, 202 U.S. 184, 194, 26 S.Ct. 648, 50 L.Ed. 987; The Eclipse, 1890, 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269; Rice v. Charles Dreifus Co., 2 Cir., 1938, 96 F.2d 80, 83; Streckfus Steamers, Inc., v. Mayor and Board Aldermen of City of Vicksburg, Miss., 5 Cir., 1936, 81 F.2d 298, 300; Luckenbach S.S. Co. v. Berwind-White Coal Mining Co., 2 Cir., 1935, 7 F.2d 793, 795; The Owego, D.C.W.D.Wash.1923, 289 F. 263, 265;

Simmons Transp. Co. v. Alpha Portland Cement Co., D.C.S.D.N.Y.1922, 286 F. 955, 958; Higgins v. Anglo-Algerian S.S. Co., 2 Cir., 1918, 248 F. 386, 389; United Transp. & Lighterage Co. v. New York & Baltimore Transp. Line, D.C.S.D. N.Y.1910, 180 F. 902, 904–905; Meyer v. Pacific Mail S.S. Co., D.C.N.D.Cal. 1893, 58 F. 923, 924; Eagle, Star British Dominions v. Tadlock, D.C.S.D.Cal.1936, 14 F.Supp. 933, 936; The Paul L., D.C. W.D.Wash.1933, 4 F.Supp. 537, 540; Suffolk Bank v. Lincoln Bank, 23 Fed.Cas., page 346, No. 13,590, 3 Mason 1, 16, 1 Benedict on Admiralty, 5th Ed., § 70, p. 96; 2 C.J.S., Admiralty, § 5 d, p. 67.

15. The Eclipse, 1890, 135 U.S. 599, 608, 10 S.Ct. 873, 876, 34 L.Ed. 269.

16. Luckenbach S.S. Co. v. Berwind-White Coal Mining Co., 2 Cir., 1925, 7 F.2d 793; Simmons Transp. Co. v. Alpha Portland Cement Co., D.C.S.D.N.Y.1922, 286 F. 955, 958; see, also, Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A., 1950, 339 U.S. 684, at page 694, 70 S.Ct. 861, 94 L.Ed. 1206, discussing power to entertain question of fraud incidental to general admiralty jurisdiction; Williams v. Providence Washington Ins. Co., D.C.S.D.N.Y.1893, 56 F. 159, 160; Higgins v. Anglo-Algerian S.S. Co., Ltd., 2 Cir., 1918, 248 F. 386.

17. The Thomas P. Beal, D.C.W.D.Wash. 1924, 298 F. 121, 122; Williams v. Providence Washington Ins. Co., D.C.S.D.N.Y. 1893, 56 F. 159; 1 Benedict on Admiralty, 5th Ed., 82, § 62.

18. Luckenbach S.S. Co. v. Berwind-White Coal Mining Co., 2 Cir., 1925, 7 F.2d 793, 795.

ty cannot act in the manner of a court of equity in granting affirmative relief from fraud, it is not because fraud, in and of itself, is inconsistent with admiralty jurisdiction. Admiralty in such circumstance is so limited merely because in such cases the first and fundamental exercise of power necessary, would be wholly of a non-maritime nature.[19] But where the first and fundamental exercise of judicial power is maritime, and the issue of fraud arises incidental to its general jurisdiction, then a court of admiralty may deal with the question of fraud, though intrinsically non-maritime, pursuant to its power to make a complete adjustment of rights over which admiralty has independent jurisdiction.[20] As succinctly stated by the second circuit:

> "That jurisdiction depends in our judgment altogether upon the cause of suit which the libelant brings before the court; if that be once maritime, the court may dispose of it completely without the need of any other suit in the same, or any other court; it is omnicompetent within its sphere."[21]

Accordingly, where the original jurisdiction is maritime, a court of admiralty may entertain an issue of fraud, mistake, or other equitable claim,[22] where either is alleged as affecting the rights of parties to a maritime action.

The Stanley H. Miner, D.C.E.D.N.Y. 1909, 172 F. 486, presented an issue very similar to that in the instant case. There the libelant claimed salvage on a quantum meruit basis. Claimant answered by setting up a contract which allegedly covered the same services. Libelant, in reply, attempted to obtain a release from the contract by means of an affirmative defense that the contract was never binding because induced by fraudulent misrepresentations. Upon the trial, the claimant moved to dismiss on the ground that the libelant should have brought an action in equity to rescind or reform his contract, and to recover upon an accounting; or that he should have brought his action in the state court for fraud and for damages, if he claimed the right to be released from the contract on that ground. The court denied the argument of claimant and allowed the affirmative defense, stating at page 493:

> " * * * and while an action to reform a contract or for an accounting based upon fraud may be equitable, nevertheless fraud itself is a valid defense, and the court can see no reason why the issue presented in the present action could not be disposed of properly."[23]

The fraud issue in the instant case was introduced by way of defense, and from the foregoing authorities it is apparent that if the first and fundamental exercise of power was purely maritime, the court below was not thereby ousted of its admiralty jurisdiction.

That the initial exercise of power therein *was* maritime is clear, since the cause originated as a libel for wages and damages resulting from wrongful action relating to a fishing lay. Ever since the opinion of Justice Story in Harden v. Gordon, 1823, Fed.Cas.No. 6,047, 2 Mason 541,[24] it has been settled in the maritime law of the United States that seamen are the wards of Admiralty, and as such the courts of admiralty vigilantly guard against any encroachment

19. See Luckenbach S.S. Co. v. Berwind-White Coal Mining Co., 2 Cir., 1925, 7 F.2d 793, 795.

20. Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 1950, 339 U.S. 684, 693, 694, 70 S.Ct. 861, 94 L.Ed. 1206. See, also, recent cases of: Sword Line, Inc., v. United States, 2 Cir., 228 F.2d 344, affirmed 76 S.Ct. 1047; and Archawski v. Hanioti, 350 U.S. 532, 76 S.Ct. 617.

21. Rice v. Charles Dreifus Co., 2 Cir., 1938, 96 F.2d 80, 83.

22. Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 1950, 339 U.S. 684, 692, 70 S.Ct. 861, 94 L.Ed. 1206.

23. See also The Clandeboye, 4 Cir., 1895, 70 F. 631, 637; The Emma B., D.C.D. N.J.1906, 140 F. 771; The John E. Mulford, D.C.S.D.N.Y.1883, 18 F. 455, 458.

24. See also Brown v. Lull, 1836, Fed.Cas. No.2,018, 2 Summ. 443.

upon their rights.[25] The jurisdiction of courts of admiralty over the wage claims of seamen is anciently established. From the dawn of maritime commerce, the necessity for skilled and courageous mariners has been recognized and the law has jealously protected them as to certain and prompt payment of wages or compensation by other methods.[26] Originally, seamen were compensated by a stake or share in the profits of the voyage. More recently, it has become customary to pay fixed wages, but the old form survives in the lay plan employed in the more speculative pursuits of sealing, whaling, and fishing. Fishermen, although possessing wages and customs peculiar to their business, are nonetheless seamen, and in general receive the same protection. Therefore, despite compensational differences, lay fishermen or sharesmen possess a right similar to that enjoyed by regular seamen, to lien the vessel and catch on board to secure their compensation,[27] and this right is maritime in nature.

Having concluded that the district court properly took jurisdiction, we next proceed to a consideration of the question of the recovery.

The record on this point is somewhat confusing, since it is not readily apparent on what theory recovery was predicated. The court found that the nature of the maritime liens of the appellees were for seamen's wages, and consequently commanded a lien superior to appellants' ship mortgage lien; but, at this point, an inconsistency appears in the theory of recovery.

■ No wages were here specified in the original contract. Compensation was to be solely dependent upon the catch. But there was no catch, since the vessel was libeled before the voyage commenced. It is well settled that no maritime lien can be allowed to seamen for wages accruing subsequent to the time the ship is taken into *custodia legis*,[28] and particularly is this true where, as here, the libel is filed by the crew of the vessel.[29] The theory here is that the act of seizing a ship, pursuant to legal process, effectively terminates the voyage, and thereby discharges the crew with no further claim for wages.[30] Thus, seamen's wage claims are only effective for those services performed *prior to* libel. From this it is clear that any compensation recoverable to appellees, *as wages*, must have accrued at or prior to the time that appellee Lower libeled the "Silver Spray." While not unquestioned,[31] courts have, in similar situations, allowed recovery not for wages, but as damages for breach of the seaman's employment contract by wrongful discharge. This, on the theory that such claim becomes matured at the time of the wrongful discharge,[32] or, in our case, by the abandonment of the contract by Tobin.

25. That the doctrine has not been without its critics, see: "Old Father Antic The Law": The Favorites of The Courts of Admiralty, by Erskine Wood, 41 American Bar Assoc. Journal, No. 10, page 924 (1955).

26. "The services of the ship's company is the maritime service, which is entitled to the highest consideration and the greatest favor; and the jurisdiction of the Admiralty in cases of mariners' wages is settled by a course of decisions of unbroken authority during centuries." 1 Benedict on Admiralty, 6th Ed., § 80, p. 247.

27. Old Point Fish Co. v. Haywood, 4 Cir., 1940, 109 F.2d 703, 704–705; United States v. Laflin, 9 Cir., 1928, 24 F.2d 683, 685; The Georgiana, 1 Cir., 1917, 245 F. 321, 325; The Carrier Dove, 1 Cir., 1899, 97 F. 111, 112, 46 U.S.C.A. § 533, R.S. § 4393; 1 Benedict on Admiralty, 6th Ed., § 81, p. 249.

28. Collie v. Ferguson, 281 U.S. 52, 50 S.Ct. 189, 74 L.Ed. 696; Old Point Fish Co. v. Haywood, 4 Cir., 1940, 109 F.2d 703, and cases collected at page 705; The Young America, D.C., 30 F. 789, 790; The Grapeshot, D.C., 22 F. 123.

29. Vlavianos v. The Cypress, 4 Cir., 1948, 171 F.2d 435, 438.

30. 1 Benedict on Admiralty, 5th Ed., p. 709.

31. Old Point Fish Co. v. Haywood, 4 Cir., 1940, 109 F.2d 703, 706.

32. The Wanderer, C.C.La.1880, 20 F. 655; The Lakeport, D.C.W.D.N.Y.1926, 15 F.2d 575.

■ Applying this reasoning to the instant case, since Tobin had wrongfully abandoned his contracts for the tuna venture *before* the date of the libel, appellees' claims for damages had accrued before the vessel entered *custodia legis*, and did not depend upon facts occurring subsequent to that time. We conclude that the appellees' claims existed at or *before* the time the ship was libeled, and were in no way cut off by said libel.

We next consider the right of appellees to recovery in absence of a catch. Some early cases deny the right of seamen on a fishing lay to lien the vessel for claims arising from their share agreement until the earnings of the vessel are ascertained and liquidated.[33] This view is founded on the argument that the original fishing shares contract contemplated that the sharesmen's compensation should come solely from the catch; and to allow sharesmen to lien the vessel for claims arising from their contract would be to subvert the original contract as made by the parties, and substitute one of the court's making in its place. Such an interpretation may be justified where the failure to secure the requisite catch results from natural causes or factors which could be said to be within the scope of the contractual risk, and is not caused by abandonment by the owner. But here, Tobin, by his action in taking the Silver Spray to Alaska (an act outside the scope of the parties' share contract), abandoned the enterprise, wrongfully discharged appellees, and precluded any possibility of successful performance of the original lay. The failure of the voyage to produce any catch was not attributable to natural causes, or fishermen's luck, nor to any factor that might be said to be embraced by the share contract. The failure was solely due to the actions of the owner, and the sharesmen were without fault in the matter,[34] having performed their agreement to the best of their ability and opportunity. While the trial court acted correctly under these circumstances in allowing some measure of recovery to the appellees, it erred in adapting as a standard of damages the probable profit from the voyage, if carried out in accordance with Tobin's original representation, thus allowing each appellee, with the exception of Kadlec,[35] the full value of his respective share in the prospective catch as estimated.

■ Although the gauge of damages for breach of nearly all commercial contracts, is the value of the future profits encompassed by the contract, nevertheless such profits must be determined with reference to some substantial criterion, without which any award would be merely speculative.[36] Accordingly, it has been quite uniformly held that prospective profits from a fishing lay are too speculative and uncertain to be a proper measure of damages.[37] Prospective profits are generally allowed only where there is an established going business, with a record of past profits for similar periods,[38] or where the job contracted

33. Williams v. The Sylph, D.C.S.D.N.Y. 1841, 29 Fed.Cas. page 1407, No. 17,740.

34. In Sigurjonsson v. Trans-American Traders, 5 Cir., 1951, 188 F.2d 760, 762, the court, while holding that lack of evidence prevented application, indicated that an exception to the general rule that sharesmen can only recover from the earnings of the vessel, exists where the owner, by his wrongful abandonment, makes the accomplishment of the enterprise impossible.

35. Who was found to be a salaried employee and not a sharesman.

36. Georgia Kaolin Co. v. United States, 5 Cir., 1954, 214 F.2d 284, 285; Connecticut Railway & Lighting Co. v. Palmer, 2 Cir., 1940, 109 F.2d 568, 571; 25 C.J.S., Damages, § 28, p. 493 et seq. See also: Manss-Owens Co. v. H. S. Owens & Son, 1921, 129 Va. 183, 105 S.E. 543, 549.

37. Old Point Fish Co. v. Haywood, 4 Cir., 1940, 109 F.2d 703, 706; Williams v. The Sylph, 1841, 29 F.Cas. page 1407, No. 17,740. See also: Polar S.S. Corp. v. Inland Overseas S.S. Corp., 4 Cir., 1943, 136 F.2d 835, 840, 841, which applies the principle to breach of a bareboat charter.

38. Ellerson v. Grove, 4 Cir., 1930, 44 F. 2d 493, 499; Central Coal & Coke Co. v. Hartman, 8 Cir., 1901, 111 F. 96.

for was subsequently completed by another, thereby realizing the profits,[39] or where the same person or persons had in the past performed the same job in the same place.[40] In each of these cases there is a yardstick of prior profits, a definite knowledge of the parties' past productivity which, while perhaps not exact, will enable the court to project with reasonable certainty the profits which would have resulted had the operation once more been carried out.

The instant case involves a new venture: none of the appellees had ever before engaged in tuna fishing. Tobin himself was a railroad brakeman, not a commercial fisherman. As succinctly stated by appellee Bunker, "I believe the trade name is, we were [all] green beans." Furthermore, there was no testimony as to the earning capacity of the Silver Spray. It is true that appellees' expert witness, Petrick, testified as to the probable earnings of refrigerated tuna clippers with live bait tanks; however, when shown a picture of the Silver Spray, Mr. Petrick stated: "This vessel is no bait boat. This is a jig or trolling boat. Well, we are or have been talking about bait boats." [41] No further evidence was adduced on the subject of the Silver Spray's earning capacity, leaving the court in the position of speculating on that vital subject. In so doing, the court acted in absence of a sufficient standard and was in error.

But this is not to say that appellees are without redress. Even though a claim for loss of profits is disproved as too uncertain, the court may allow, as an alternative, one of the standardized measures of recovery.[42] Where one party to a contract prevents the other from performing his portion thereof, the latter may abandon it and recover on the common counts.[43] The theory of recovery in such cases was clearly stated in United States v. Behan, 1884, 110 U.S. 338, 344, 4 S.Ct. 81, 83, 28 L.Ed. 168:

"The *prima facie* measure of damages for the breach of a contract is the amount of the loss which the injured party has sustained thereby. If the breach consists in preventing the performance of the contract, without the fault of the other party, who is willing to perform it, the loss of the latter will consist of two distinct items or grounds of damage, namely, First, what he has already expended towards performance, (less the value of material on hand); sec-

39. The Hunter, D.C.Cal.1886, 47 F. 744, holding a sharesman who left the venture is entitled to have his account settled upon the basis of the actual catch of the vessel; Manss-Owens Co. v. H. S. Owens & Son, 1921, 129 Va. 183, 105 S.E. 543, and cases at pages 549 and 550.

40. Malone v. Hastings, 5 Cir., 1912, 193 F. 1, damages based upon the results of unmatured crops held not speculative where there is evidence of the actual matured value of other crops of a like kind, cultivated during the same period, in the same vicinity, and under substantially similar conditions; The Paul L., D.C.W.D. Wash.1933, 4 F.Supp. 537, 540, which applied the principle to fishing ventures, and allowed recovery only because respondent had previously fished the same waters with the same boat, providing an adequate standard.

41. Further questioning of witness Petrick was revealing:
"Q. But all the evidence you have given on that subject contemplates a live bait boat of large capacity with a large crew of experienced men? A. * * * My testimony has been on the basis of a bait boat. * * *
"Q. Has no relation to a jig boat such as the photograph discloses? A. No, sir. * * *
 * * * * *
"Q. What is the essential difference between a jig boat and a clipper? A. A jig boat can be used in very small vessels, and they troll like they troll for salmon. They draw a line through the water. The poles are indicated. They have lures hanging from these just like a salmon troller. A bait boat is one that has circulating salt water and tanks with live bait, little bait in them kept alive."

42. Polar S.S. Corp. v. Inland Overseas S.S. Corp., 4 Cir., 1943, 136 F.2d 835, 841; McCormick on Damages, page 106.

43. Perkins v. Hart, 1826, 11 Wheat. 237, 248, 24 U.S. 237, 248, 6 L.Ed. 463.

ondly, the profits that he would realize by performing the whole contract. The second item, profits, cannot always be recovered. They may be too remote and speculative in their character, and therefore incapable of that clear and direct proof which the law requires. \* \* \* When a party injured by the stoppage of a contract elects to rescind it, then, it is true, he cannot recover any damages for a breach of the contract, either for outlay or for loss of profits; he recovers the *value* of his services actually performed as upon a *quantum meruit.* There is then no question of losses or profits. But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is the amount which he has been induced to expend on the faith of the contract, *including a fair allowance for his own* time and services." [Emphasis supplied.]

 Accordingly, appellees are entitled to the respective amounts expended for the working share agreements. Due to the speculative nature of the prospective profits, they cannot be recovered as damages; however, appellees are entitled to a fair allowance for their time and services in sailing the Silver Spray to Alaska and back, at Tobin's request. Just what constitutes a fair allowance for time and services in these circumstances is a question which the trial court may ascertain and award, taking into consideration the experience and duties of each appellee, and the length of time each spent aboard the ship.

We further hold that this reasonable allowance for time and services under the circumstances of this case is in the nature of seaman's wages and thus should be given priority over the mortgage of appellants.

Those appellees who each paid $2500 to Tobin are entitled to a judgment against Tobin for such sum, but inasmuch as these sums are being awarded strictly on the basis of breach of contract, and not wages, they should not be given priority over the mortgage of appellants. The costs allowed by the trial court are affirmed.

The judgment in favor of Appellee Kadlec is affirmed and is entitled to priority over the mortgage of appellants.

The judgment in favor of appellants against Tobin, not contested here, for $30,725, together with attorney fees and costs, is affirmed. The deficiency judgment entered against Tobin, not contested, is likewise affirmed except that the amount of the deficiency is to be determined on the basis of the recoveries allowed the appellees and appellants as a result of this opinion.

Affirmed in part; reversed in part; and remanded for further proceedings in accordance with this opinion.