865 F.2d 24
 1989 A.M.C. 488, 57 USLW 2400
 CITIBANK, N.A. and Bank of America Trust and Savings
Association, as Trustee/Mortgagees, Plaintiffs-Appellees,
C.E. DeFries, C.W. Daulley, Edmund Davis, C.E. Dodson, Karl
Landgrebe, D.K. Masingo, Thomas Murphy, Franklin Riley, Jr.,
William Ristine, R.F. Schamann, Philip Shapiro and Allen
Taylor, as Trustees and on behalf of the MEBA Pension Trust,
Plaintiffs-Intervenors-Appellants,
v.
The VESSEL AMERICAN MAINE, and the VESSELS AMERICAN
KENTUCKY, AMERICAN ALABAMA, AMERICAN NEBRASKA, AMERICAN
UTAH, and AMERICAN VIRGINIA, their boilers, engines,
machinery, tackle, apparel, furniture, bunkers, equipment
and all other appurtenances belonging to the vessels, in
rem, Defendants.
 Nos. 315 to 320, Dockets 88-7572, 88-7574, 88-7582, 88-7584,
88-7592 and 88- 7594.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 3, 1988.
Decided Dec. 27, 1988.
 
 Joseph E. Kolick, Washington, D.C. (Dickstein, Shapiro and Morin, Washington, D.C., of counsel), for plaintiffs-intervenors-appellants.
 William S. Busch, New York City (Cadwalader, Wickersham & Taft, New York City, of counsel), for plaintiffs-appellees.
 Before WINTER, MINER and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Plaintiffs-intervenors-appellants C.E. DeFries et al. ("Trustees") are trustees of a pension benefit trust on behalf of the Marine Engineers' Beneficial Association ("MEBA"). Plaintiffs-appellees Citibank, N.A. and Bank of America National Trust and Savings Association ("Banks") are holders of first preferred ship mortgages on six vessels owned by mortgagor U.S. Lines, Inc. ("U.S. Lines"). The Trustees appeal from a judgment entered in the United States District Court for the Southern District of New York (Keenan, J.) pursuant to its admiralty jurisdiction, 28 U.S.C. Sec. 1333, 46 U.S.C.App. Sec. 951 (Supp. II 1984), holding that MEBA's claim for unpaid employer contributions to the MEBA Pension Trust did not give rise to a preferred maritime lien under the Ship Mortgage Act of 1920, 46 U.S.C.App. Sec. 953(b) (Supp. II 1984) ("Ship Mortgage Act"). The Trustees contend that unpaid contributions to the MEBA Pension Trust are "wages of the crew" entitled to preferred status under 46 U.S.C.App. Sec. 953(a). We disagree and, accordingly, affirm the judgment of the district court.
 
 BACKGROUND
 
 2
 Shipowner U.S. Lines, Inc. employed licensed marine engineers as crewmembers aboard a fleet of approximately 26 seagoing vessels. The engineers were represented by the Marine Engineers' Benevolent Association, AFL-CIO, District No. 1--Pacific Coast District. Pursuant to a collective bargaining agreement between MEBA and various shipowners, the shipowners established a pension plan for the benefit of their engineers and other employees. The pension plan was to provide several kinds of benefits and was to be administered through a pension trust.
 
 
 3
 Among the benefits provided for by the MEBA pension plan was a "Money Purchase Benefit." Pursuant to MEBA's pension trust regulations, U.S. Lines and other signatory employers were required to contribute to the Money Purchase Benefit fund ("MPB fund") an amount equal to 5% of the base and non-watchstanding wages paid to their union employees. All MPB fund contributions from the various shipowners were received by MEBA pension trustees, who placed the contributions into a single, separate account for investment. At no time were employer contributions deposited directly into accounts in the name of specific union employees. Instead, for recordkeeping purposes, the Trustees maintained "Individual Contribution Accounts" in the name of each eligible employee. On a yearly basis, the trustees "allocated" to each of these accounts an amount representing a share of the employer's contribution, and a share of the interest earned on the entire multi-employer MPB fund. The trustees annually rendered statements to individual union members, which reflected their Money Purchase Benefits.
 
 
 4
 On November 26, 1986, U.S. Lines filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court. On October 8, 1987 by prior leave of the Bankruptcy Court, the Banks commenced proceedings in the United States District Court against six U.S. Lines vessels, including the ships American Maine, American Kentucky, American Alabama, American Nebraska, American Utah and American Virginia (the "vessels"). Pursuant to the Ship Mortgage Act, the Banks sought foreclosure of first preferred ship mortgages held by them and the sale of the vessels for an indebtedness in excess of $170,000,000. After orders for the interlocutory sale of the vessels were entered in the district court, the Banks purchased the vessels at auction for $4,000,000 each. The sales were confirmed by the district court by orders dated December 28, 1987. On December 29, 1987, the district court granted the Trustees leave to intervene in the foreclosure actions for the purpose of asserting in rem claims against the proceeds of the sale of the vessels.
 
 
 5
 The claims arose from the alleged failure of U.S. Lines to make MPB fund contributions on behalf of engineers employed aboard the six defendant vessels and 20 other ships operated by it. The Trustees explained that upon failure of U.S. Lines to make its contributions, an amount equal to the default was "credited" to the Individual Contribution Accounts of U.S. Lines' engineers. The amount credited came from the interest generated by the MPB fund. Such credits were required to be made by the Trustees in the event of an employer's delinquency and were considered "administrative expenses" of the pension trust.
 
 
 6
 The Trustees attempted to show that even though U.S. Lines' defaulted contributions were credited to each engineers' account, the default nonetheless resulted in "actual economic loss" to all MPB fund participants. They explained the loss as follows:
 
 
 7
 The employer's monthly contribution to the MPB Plan represents the aggregate of the monthly contribution due for each covered employee. The aggregate sum is deposited in the MPB [fund] and is invested. When an employer fails to make its required contributions, less money goes into the investment pool and therefore less investment income is generated. As a result, each participant earns less interest income.
 
 
 8
 Affidavit of Lucille Hart in Support of Plaintiffs-Intervenors' Motion for Summary Judgment (emphasis added). The Trustees considered the loss to have been composed of "(1) the investment income that would have been earned had the initial investment pool included all required contributions, and (2) the investment income required to 'make up' the delinquent contributions." Id. They sought a total of $113,330 in contributions and interest on behalf of U.S. Lines' engineers.
 
 
 9
 The Trustees contended that the unpaid contributions were "wages of the crew." They argued that under the general maritime law, wages of the crew create a "preferred maritime lien," which has priority over a mortgage lien by the terms of the Ship Mortgage Act. The Banks moved and the Trustees cross-moved for summary judgment on the issue of whether the unpaid contributions were wages of the crew.
 
 
 10
 In its memorandum opinion, the district court distinguished between a claim for unpaid contributions and a claim for loss of employees' benefits. The court noted that the seamen did not assert claims for a loss of benefits in this case. The court held that since no such loss was claimed, the unpaid contributions did not give rise to a preferred wage lien cognizable under the Ship Mortgage Act.
 
 
 11
 On appeal, the Trustees essentially advance the same arguments brought before the district court. They contend that under the general maritime law, the seaman's lien for wages is intended to protect seamen's compensation regardless of its form, and attaches "wherever necessary to guarantee that seamen receive all promised compensation." They argue that in order to effectuate the purpose of the Ship Mortgage Act, contributions to the MPB fund should be treated as wages and given the status of preferred liens.
 
 DISCUSSION
 
 12
 There are no material facts in dispute on this appeal. Our only task is to decide whether the Banks were entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). We review the summary judgment motion de novo. See Doe v. New York University, 666 F.2d 761, 765 (1981).
 
 
 13
 In the romantic idiom peculiar to admiralty law, the seaman's lien for wages is a "sacred lien" which "adheres to the last plank of the ship." Sheppard v. Taylor, 30 U.S. (5 Pet.) 675, 710, 8 L.Ed. 269 (1831). In the instant appeal, both parties recognize the validity of this rule. Each contends, however, that we should decide the broader issue of whether "fringe benefits" are entitled to lien status under the Ship Mortgage Act and the general maritime law. We decline this invitation. Instead, we confine ourselves to the narrow question of whether unpaid contributions to the MPB fund created a wage lien in this case.
 
 
 14
 Under the terms of the Ship Mortgage Act, upon the foreclosure and sale of a mortgaged ship, all preexisting lien claims on the ship are terminated and "thereafter attach ... in accordance with their respective priorities, to the proceeds of the sale." 46 U.S.C.App. Sec. 953(b). In these circumstances, a preferred mortgage lien takes priority over all claims against the ship except "preferred maritime liens" and expenses allowed by the court. Id. Among the preferred maritime liens enumerated by the statute are claims for "wages of the crew of the vessel." 46 U.S.C.App. Sec. 953(a).
 
 
 15
 The Trustees argue that for purposes of protecting the seamen's Money Purchase Benefits, U.S. Lines' contributions should be treated as though they are wages of the crew. In order to consider the Trustees' arguments properly, it is essential to note what claims are not being advanced here. Strictly speaking, no claim for lost wages arising from U.S. Lines' failure to contribute to the MPB fund can be asserted. Under the MPB regulations as applied by the Trustees, U.S. Lines' unpaid contributions were treated as an administrative expense of the trust. Even assuming for purposes of this case that employer contributions to the fund were intended as employee compensation, when the Trustees satisfied U.S. Lines' unpaid contributions, they, in effect, paid the defaulted wages. As a result, the engineers did not suffer a loss in the employer contribution portion of their Money Purchase Benefit. Insofar as U.S. Lines' seamen required protection from their employer's default, resort to the maritime wage lien is unnecessary here. Such protection has already been accomplished by the acts of the Trustees.
 
 
 16
 As the Trustees have conceded, money used for this purpose was considered an "administrative expense" of the trust. Having treated the expenditures as administrative costs, the Trustees cannot now be heard to argue that they are, in fact, "wages of the crew." Quite simply, the seamen are not entitled to reimbursement for administrative expenditures of the Trustees. Cf. United States v. Embassy Restaurant, Inc., 359 U.S. 29, 33-34, 79 S.Ct. 554, 556-57, 3 L.Ed.2d 601 (1959) (where contributions to union welfare trust were not payable to employees, trustees could not assert wage claim on behalf of union under the Bankruptcy Act); Long Island Tankers Corp. v. S.S. Kaimana, 265 F.Supp. 723, 729 (N.D.Cal.1967) (test is not whether claims for contributions are asserted on behalf of employees, but whether claims "come within the protection of the 'seaman's maritime claim' "), aff'd, 401 F.2d 182 (9th Cir.1968), cert. denied sub nom. Cross v. The Kaimana, 393 U.S. 1095, 89 S.Ct. 879, 21 L.Ed.2d 785 (1969).
 
 
 17
 The Trustees argue, however, that seamen will have less money in their Individual Contribution Accounts as a result of U.S. Lines' default, and therefore will receive less compensation upon retirement. An exhibit submitted by the Trustees and presented to the district court purports to demonstrate that sums allocated to the engineers' Individual Contribution Accounts after the default were lower than the sums which would have been allocated had the contributions been made. To protect the seamen's entire Money Purchase Benefit, the Trustees seek recovery of the unpaid contributions by means of the wage lien. They contend that it is left to the courts of admiralty to decide what constitutes a wage lien, and that this court should define the term broadly to protect all seaman's compensation regardless of its form.
 
 
 18
 Whether viewed broadly or narrowly, however, the hallmark of a wage lien is that the wage owed to a seaman has accrued by virtue of his service to a particular ship. As enunciated in Long Island Tankers,
 
 
 19
 [f]rom the earliest period of maritime commerce the test in admiralty courts for determining whether there is a seaman's wage lien has been: Has a maritime service been performed? If such service has been performed, then whatever constitutes the compensation for the service, if reducible to money, may be enforced by a maritime lien against the vessel upon which those services were performed.
 
 
 20
 265 F.Supp. at 726. Underlying the wage lien is the fact that "without the seaman's efforts in bringing the ship safely to port, there would be no res against which other creditors could assert claims." International Paint Co. v. M/V Mission Viking, 637 F.2d 382, 385 (5th Cir. Unit B 1981) (citation omitted); see Payne v. S.S. Tropic Breeze, 423 F.2d 236, 242 (1st Cir.) (wage liens given priority because "services of seamen are absolutely essential to the navigation of the vessel"), cert. denied, 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970); New England Fish Co. v. The Barge or Vessel Sonya, 332 F.Supp. 463, 466-67 (D.Alaska 1971) (citing 1 Norris, The Law of Seamen Sec. 447 (1962)) (test for determining entitlement to wage lien is, inter alia, whether services rendered are maritime and whether seaman is aboard to aid in navigation); Kopac International, Inc. v. M/V Bold Venture, 638 F.Supp. 87, 93 n. 4 (W.D.Wash.1986) (same).
 
 
 21
 In our judgment, the Money Purchase Benefit at issue in this case does not fit the definition of wages of the crew. Funding for the MPB plan is provided by all marine employers who are parties to the union collective bargaining agreement. Benefits will eventually be paid not only to seamen aboard U.S. Lines' 26 vessels, but to all of the seamen represented by AFL-CIO (MEBA) Pacific Coast District. Very few of the seamen who will eventually be paid their Money Purchase Benefits have performed services aboard the six vessels subject to the liens. While the Trustees purport to show a loss to the MPB fund resulting from U.S. Lines' default, such loss is not relevant to our determination. What is important is that the losses projected by the Trustees cannot be assigned to marine engineers serving aboard the liened vessels. Rather, these losses will be shared by all of the union engineers regardless of where they served.
 
 
 22
 Moreover, the MPB plan documents reveal that an individual seaman's realization of his Money Purchase Benefit is dependent upon several factors. Employee forfeitures, administrative costs of the trust, and trustee discretion and control of the funds all determine eventual payment of the benefit. These factors are unrelated to a seaman's actual service aboard a particular vessel. Because the Money Purchase Benefits and the losses which may accrue thereto cannot be tied to the service of particular seamen aboard a specific vessel, they are not "wages of the crew of the vessel."
 
 
 23
 Another consideration leads us to conclude that the Money Purchase Benefits at issue are not "wages of the crew." Admiralty courts have held that compensation for services, in order to be enforceable as a lien, must be "reducible to money." In other words, the compensation must be convertible to a cash equivalent. See West Winds, Inc. v. M.V. Resolute, 720 F.2d 1097, 1100-01 (9th Cir.1983), cert. denied, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984); Long Island Tankers, 265 F.Supp. at 726. Application of the rule can readily be seen in Putnam v. Lower, 236 F.2d 561, 570-73 (9th Cir.1956). In Putnam, the court examined a wage lien given to seamen who were to have shared the profits from an aborted fishing venture. The Ninth Circuit upheld recovery of a sum of money, but solely on the theory that a contract had been breached by abandonment of the voyage. Because profits from the untried venture were too speculative to be readily calculable, the sums awarded could not be denominated "wages." Hence, they were not given priority over a preferred ship mortgage.
 
 
 24
 As indicated above, a seaman's realization of his Money Purchase Benefit is dependent upon several different factors. Many of these factors prevent calculation of the present value of the benefit. For example, administrative costs and expenses of the trust are chargeable against the MPB fund. Such costs may include, among other things, fees for professional consultants, leasing or purchasing premises, and hiring employees. Ironically, the expenses also include costs in connection with employer delinquencies in making contributions to the fund. In addition, investment losses are chargeable to the fund.
 
 
 25
 Given these contingencies, the relationship between U.S. Lines' contribution to the MPB fund and eventual realization of the Money Purchase Benefit is uncertain. The point is that the Money Purchase Benefit cannot readily be converted to its present-day cash equivalent. The fact that entitlement to the benefit has "vested" for some employees does not change this result. Even for vested seamen, realization of a particular sum of money can only be a matter of speculation.
 
 
 26
 Finally, our interpretation of "wages" is consistent with that reached by the Supreme Court in Morrison-Knudsen Construction Co. v. Director, Office of Workers' Compensation Programs, 461 U.S. 624, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983). Construing the definition of "wages" found in the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 902(13) (1982 & Supp. III 1985), the Court held that employer contributions to union trust funds are not "wages" for purposes of the LHWCA. 461 U.S. at 637, 103 S.Ct. at 2053. Central to its reasoning was that an employer's contribution could not be expressed in terms of a present value. Id. at 630-32, 103 S.Ct. at 2048-50. The Court's holding in Morrison-Knudsen was predicated on the language and history of the longshoremen's statute. Nevertheless, maritime law regarding wages does not differ in any significant degree from the Court's analysis of a "cash equivalency" requirement.
 
 CONCLUSION
 
 27
 For the foregoing reasons, we hold that unpaid contributions to the MEBA Pension Trust at issue here are not "wages of the crew" and therefore do not create a lien for seamen's wages cognizable under the Ship Mortgage Act. Accordingly, the judgment of the district court is affirmed.